IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| LITTLE ROCK CARDIOLOGY CLINIC, P.A., et al., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 4-06-cv-1594-JLH |
| BAPTIST HEALTH, | ) ) ) | |
| Defendant. | ) | |

## BAPTIST HEALTH'S REPLY TO PLAINTIFFS' OPPOSITION TO BAPTIST'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Baptist Health's motion to dismiss is based not on "re-stated, reshaped allegations that differ from the Amended Complaint" as Plaintiffs' Brief in Opposition (Opp'n) asserts (Opp'n at 1) but on Plaintiffs' failure to allege a crucial essential element of their claims sufficiently—the relevant product market—and on the Amended Complaint's own allegations showing that the statute of limitations bars their claims. Plaintiffs' burden at this stage of the litigation admittedly is low, but they do have the burden to allege each essential element of their claims, together with at least some facts supporting each, in a manner to provide Baptist with fair notice of each element. A court need not accept a plaintiff's bald assertions, characterizations, or conclusions, e.g., DM Research, Inc. v. Coll. of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999), and the court does not assume a plaintiff can prove facts it has not alleged, Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 526 (1983). Moreover, the court should dismiss the

682861

plaintiffs' claims where the complaint shows that they are time-barred. E.g., R.W. Murray Co. v. Shatterproof Glass Corp., 697 F.2d 818, 821 (8th Cir. 1983).

Clear definition of the relevant product market is particularly important in this case because it appears from the face of the Amended Complaint, notwithstanding Plaintiffs' conclusory allegation to the contrary, that Plaintiffs and Baptist are not even participants in the same relevant product market. If Plaintiffs are alleging a relevant product market of their own physician services and their exclusion from that market, as the Amended Complaint appears to allege (Am. Comp. ¶¶ 22, 43, 50, 55) and as Baptist believed, this Court should dismiss the case because Plaintiffs allege no facts to support the conclusory allegation that Baptist even competes in that market. Plaintiffs do not dispute this. If, as Plaintiffs seem to claim now, the relevant product market consists of the hospital services provided by Baptist, the Amended Complaint should be dismissed because there are no facts supporting an allegation that Plaintiffs compete in that market. Moreover, the Amended Complaint alleges that the purported violations began in 1997, and there are no allegations of any overt acts within the statute-of-limitations period of the sort that would extend the statute for some nine years until this case was filed late last year.

## I. Plaintiffs' Failure To Allege That The Parties Are Consumers Or Competitors In The Same Relevant Product Market

Proper definition of the relevant product market is an essential element of Plaintiffs' case. They must allege a relevant product market together and at least some facts supporting their definition of that market. Here, Plaintiffs allege, in a one-sentence conclusory statement, a relevant product market of "cardiology services for privately insured individuals" (Am. Compl. ¶ 11)—with no description or facts whatsoever of the

2

cardiology services comprising this "market," why these services constitute a relevant product market, or even whether they are referring to services provided by physicians or hospitals. Cf. E & L Consulting, Ltd. v. Doman Indus., Ltd., 472 F.3d 23, 31 (2d Cir. 2006) (dismissing the claim in part based on plaintiff's insufficiently pled relevant product market definition of "finished wood products," which "is a term that covers an enormous variety of goods with an enormous number of uses. The phrase is exceptionally broad and vague, potentially encompassing hundreds of different products, and the complaint does not attempt to define the phrase or even narrow the range of things or products to which the phrase might apply."). As Baptist's memorandum supporting its motion to dismiss explained, the Amended Complaint appears to allege that this market is that for services the Plaintiffs provide—cardiology services rendered by physicians. (Baptist Mem. at 2-4.)

Plaintiffs' Opposition continues to obfuscate the relevant product market they attempt to allege by failing to identify whose services they mean to include. They claim that they "compete in that market" as Baptist does (Opp'n at 1) but fail to allege any facts to support any inference that Baptist provides physician services or that they provide hospital-facility services. Services provided by hospitals and those provided by physicians are completely different services and different relevant product markets, as the very case Plaintiffs cite, Gordon v. Lewistown Hosp., 272 F. Supp.2d 393, 413 (M.D. Pa. 2003), aff'd, 423 F.3d 184 (3d Cir. 2005), makes clear. The relevant product market, broadly speaking, includes services that are reasonable substitutes for one another or that are reasonably interchangeable in the eyes of consumers, e.g., HDC Med., Inc. v. Minntech Corp., ___ F.3d ___, 2007 WL 174398, slip op. at 4 (Jan. 25, 2007), which

3

services provided by physicians and those provided by hospitals clearly are not.[1] Plaintiffs fail to allege which market they claim is the relevant product market for purposes of this case. As we explained before, however, because Plaintiffs are physicians, professional corporations of physicians, and the entity through which the physicians practice, and because Plaintiffs' complaint (repeated in at least four places in the Amended Complaint) is that they "effectively were excluded from participating, let alone competing, in the market," the reasonable inference (especially since the Amended Complaint alleges no facts to the contrary) is that the relevant market is the physician services they provide.

If this is correct, Plaintiffs' claims fail as a matter of law for the reasons we explained before. (Baptist Mem. at 5-9.) Baptist cannot, as a matter of law, monopolize or attempt to monopolize that market because there is no allegation that it is even a competitor in that market, and the Amended Complaint alleges no unreasonable anticompetitive effect in that market.

Plaintiffs do not dispute the point. Rather, now they claim that they do not allege a "market for the cardiology services **provided by physicians**." (Opp'n at 2.) "That is not Plaintiffs' claim." (Id. at 3.) Instead, although never coming out and saying so, as Rule 12(b)(6) requires to provide Baptist with fair notice of their claims, Plaintiffs appear to claim that the relevant product market is that for cardiology services provided by hospitals or "facility services." They baldly assert in their Opposition that they compete

---

[1] Indeed, Plaintiffs recognize this by noting that physician services and hospital services are complements. (Opp'n at 3.) Substitutes and complements are opposites. Products are substitutes when the demand for one increases when the price of the other increases. Products are complements when the demand for one decreases when the price of the other increases. Roger L. Miller, Intermediate Microeconomics 92 (1978). With no citation, Plaintiffs claim that the two types of services may constitute "the conjoined components of the [single] product market." (Opp'n at 3.) There is no such concept of a "conjoined market" in antitrust law or economics.

4

in that market (Opp'n at 2) but provide no factual support whatsoever for this conclusory statement. Although Rule 12(b)(6) does not require Plaintiffs to provide substantial detail or actual evidence for their allegations at this stage of the case, it does not condone this "hide the ball"-type of pleading.

Assuming that Plaintiffs are alleging a relevant product market of hospital cardiology services, the Amended Complaint provides no indication of the cardiology services comprising that market or why those services might constitute a relevant product market for purposes of this case. Moreover, there are no factual allegations suggesting that Plaintiffs are either a competitor or customer in that market.

Numerous Eighth Circuit decisions, however, hold that an antitrust plaintiff should be a customer or competitor in the relevant market to have antitrust standing because customers and competitors in that market are the parties injured by the reduction in competition resulting from the violation. E.g., S.D. Collectibles, Inc. v. Plough, Inc., 952 F.2d 211, 213 (8th Cir. 1991) ("standing is generally limited to actual market participants, that is, competitors or consumers"); General Indus. Corp. v Hartz Mountain Corp., 810 F.2d 795, 809 (8th Cir. 1987) ("standing to sue under the Sherman Act is limited to a 'consumer or competitor'"); Midwest Commc'ns, Inc. v. Minn. Twins, Inc., 779 F.3d 444, 451 (8th Cir. 1985) ("The [district] court concluded that standing must be limited to actual or potential competitors foreclosed from the applicable market and to buyers hurt by the [unlawful] agreement. We agree that [plaintiff] would not fall into either category."); S. Dakota v. Kansas City S. Indus., 880 F.2d 40, 47 (8th Cir. 1987). Customers in the relevant market are injured because, for example, of the higher prices

they must pay, while competitors in the relevant market are injured because they are excluded from that market.

Plaintiffs attempt to skirt this principle by citing Blue Shield v. McCready, 457 U.S. 465 (1982), which provides that plaintiffs whose injuries are "inextricably intertwined" with the injuries the defendants intended to cause may have standing. But Plaintiffs read too much into that case (or at least more than the Eighth Circuit has read into it). Unlike Plaintiffs here, the plaintiff in that case, Ms. McCready, was a customer in the alleged relevant market—a point the Supreme Court made a year later in Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 538 (1983) ("McCready alleged that she was a consumer of psychotherapeutic services [the relevant product market] and that she had been injured by the defendants' conspiracy to restrain competition in the market for such services.").

The Eighth Circuit has recognized the McCready principle but has not taken it as far as Plaintiffs ask this Court to do. In Hartz Mountain, for example, decided five years after McCready, the court denied antitrust standing to a broker serving the relevant market, explaining that "even if [the broker's] injury was a necessary step for the defendant to take in achieving the overall suppression of the market . . . , [it] was not a consumer of goods or services subject to restraint or an injured competitor of [defendant], the party engaging in the claimed restraint." 810 F.2d at 809; see also McDonald, 722 F.2d at 1377 ("Even if the injury to the plaintiffs is characterized as directly linked to any antitrust wrongdoing by [defendant] because the 'suppression of the plaintiffs individually was a necessary step for [defendant] to take in achieving the overall suppression of the [relevant market]' . . ., the type of injury the plaintiffs suffered is not

the type the antitrust laws were intended to redress"). That Plaintiffs do not cite even one Eighth Circuit decision in their discussion of standing is telling.[2]

In sum, if Plaintiffs are alleging a relevant product market of cardiology services provided by physicians, as it appeared from the Amended Complaint, their claims fail because they fail to provide any factual support for any bald assertion that Baptist is a participant in that market. On the other hand, if they are alleging a relevant product market of cardiology services provided by hospital facilities, their claims fail because they are not participants in that market (or fail to allege any facts supporting a claim that they are).

## II. <u>The Statute Of Limitations</u>

Plaintiffs assert that, in discussing the applicability of the statute of limitations to their claims, Baptist "[a]gain ignore[ed] the Amended Complaint's allegations." (Opp'n at 10.) We did not. The Amended Complaint, itself, shows that this is a case, based on policy, logic, and law, that should have been brought years ago if at all.

There are strong policy reasons for statutes of limitations: To encourage prompt litigation, provide repose, prevent stale claims, provide certainty about potential liability, and help ensure witness memory. See generally Rotella v. Wood, 528 U.S. 549 (2000) (interpreting RICO statute of limitations, which is patterned on the antitrust statute of limitations). Here, Plaintiffs admit that the alleged conspiracy was almost ten-years old

---

[2] Interestingly, Plaintiffs rely on the Sixth Circuit's decision in <u>Province v. Cleveland Press Pub'g Co.</u>, 787 F.2d 1047 (6th Cir. 1986), which Plaintiffs note relies on another Sixth Circuit decision, <u>Southhaven Land Co. v. Malone & Hyde, Inc.</u>, 715 F.2d 1079 (6th Cir. 1983). (Opp'n at 6.). In both cases, the court held that the plaintiffs lacked standing. The reference to <u>Southhaven</u> is particularly ironic because the facts there were analytically similar those here, and the court held that plaintiff lacked standing. There, where the plaintiff and defendant were not competitors, the court rejected plaintiff's claim of standing, even though plaintiff claimed that defendant's breach of a contract between the two was the act resulting in the alleged restraint on competition, just as Plaintiffs here allege that Blue Cross and Baptist actions taken against them were the acts that resulted in adverse competitive effects in the market for services provided by Baptist.

7

when they filed suit (Am. Compl. ¶ 19), and, as the parties Blue Cross terminated in 1997, they certainly were aware of their claim. But they attempt to circumvent their statute-of-limitations problem by claiming a "continuing conspiracy." But cf. Midwestern Mach. Co. v. Northwest Airlines, Inc., 392 F.3d 265, 272 (8th Cir. 2004) ("In practice, where the plaintiff had actual knowledge of the initial violation and suffered injury, courts generally do not toll the statute of limitations based on a continuing violation theory."); Varner v. Peterson Farms, 371 F.3d 1011, 1020 (8th Cir. 2004) ("when a complaining party was fully aware of the terms of an agreement when it entered into the agreement, an injury occurs only when the agreement is initially imposed"). Permitting this case to go forward now would violate every policy reason for statutes of limitations.

Plaintiffs' continuing-conspiracy argument is based primarily on Blue Cross's refusals to reverse its 1997 termination of Plaintiffs' contracts as Blue Cross participating physicians or, as Plaintiffs put it, Blue Cross's "'refus[al] to budge'" from that decision (e.g., Opp'n at 11, quoting Am. Compl. ¶ 20) when Plaintiffs later demanded a Blue Cross contract. According to Plaintiffs, every Blue Cross "refus[al] to budge" from its 1997 termination of their contracts constituted a new overt act that continued the limitations period. This view conflicts with policy, logic, and relevant Eighth Circuit precedent.

Under Plaintiffs' view, there would never be repose or certainty about potential liability. Plaintiffs could have brought this case in 1997 and for four years thereafter. Had they done so, it would probably be decided and over by now. But under Plaintiffs' view, they could keep the matter open in perpetuity simply by, from time to time,

8

requesting Blue Cross to "budge" from its 1997 termination of their contracts. Cf. Midwestern Machinery, 392 F.3d at 271 ("[Plaintiff's] theory would expose merged firms to potential liability in private suits as long as the firms remained merged because, assuming that the initial merger violated the Clayton Act, every subsequent action by the merged firm would be a continuing violation.").

Plaintiffs' argument hinges in large part on its attempt to distinguish the Eighth Circuit's 1972 decision in Pioneer Co. v. Talon, Inc., 462 F.2d 1106 (8th Cir. 1972), upon which it relies, from that court's 2004 decision in Varner v. Peterson Farms, 371 F.3d 1011 (8th Cir. 2004), upon which Baptist relies. (Opp'n at 10-16.) That distinction, according to Plaintiffs can be summed up as follows: "The distinction between cases such as Pioneer, which involved repeated refusals to deal, and the situation in Varner, in which the conduct attacked was the fulfillment of a single contract's requirements, was apparently of such obviousness that the Eighth Circuit did not mention Pioneer when it decided Varner." (Id. at 15.)

We agree that the differences are obvious, but not in the way Plaintiffs believe. The difference is that the refusals to fill orders in Pioneer constituted the requisite overt acts because, unlike here and in Varner, there was no termination of a prior contractual relationship (as here) or commencement of a contractual relationship (as in Varner) to start the running of the statute. In Pioneer, the plaintiff, Pioneer, purchased zippers from Talon through a wholesaler, Donahue, on an order-to-order basis. There was no sales contract under which Pioneer purchased from either Talon or Donahue. When Donahue discovered that Pioneer was selling the zippers to a retailer at a discount, a Donahue representative told Pioneer, on July 24, 1964, that Donahue would no longer fill its

9

orders. Pioneer testified that it "had receive no formal commitment from anyone that orders would not be accepted," 462 F.2d at 1107; rather, the first notification it received that its orders would not be filled was on September 4, 1964, when Donahue rejected a Pioneer order. Unlike here, there was no contract in place between the parties to be terminated, and Donahue's September notification to Pioneer of its refusal to fill the order did not mention any "previous termination of business relations." Id. at 1108. When suit was filed in August 1968, defendant argued that it was barred by the statute of limitations, which it claimed began to run on July 24, 1964.

The court rejected defendant's argument because as of that date, there was no contract between the parties, nothing to terminate, no overt act injuring the plaintiff, and thus no overt act that could start the running of the statute. Since there was no contract to terminate, the defendant, according to the court, "terminated nothing of legal significance." Id. Given that fact, the statute did not begin to run until September, when defendant notified plaintiff of its termination and began to refuse to fill orders. This absence of a prior contract's termination was clearly significant, if not determinative, in the court's thinking. See id. n.3. Had there been a preexisting supply agreement between the parties that the defendants terminated, as there was here between Plaintiffs and Blue Cross, the defendants' subsequent refusals to fill the plaintiff's order would not have constituted new overt acts but rather part of, or a "reaffirmation" of, the initial termination.

In Varner, the plaintiffs entered into an allegedly unlawful tying contract with the defendants in 1996. Apparently, plaintiffs were not actually forced to purchase anything (i.e., no actual tying act occurred) pursuant to the 1996 contract until sometime within

10

four years of the suit, which was filed in 2002. The plaintiffs argued that these actual acts of tying constituted new overt acts, which extended the statute of limitations even though the parties had executed the contracts six years before suit was filed. Rejecting the plaintiffs' argument, the Eighth Circuit explained that "[p]erformance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period." 371 F.3d at 1020.

Here, Plaintiffs attempt to distinguish the scenario in <u>Varner</u> from their situation by arguing that, in <u>Varner</u>, since the later acts were "preordained" and "contractually required" by the 1996 contracts, the court correctly held that they were not new overt acts. (Opp'n at 11.) This, however, is a distinction without a difference here. The subsequent actions both here and in <u>Varner</u> (but not in <u>Pioneer</u>) emanated from a preexisting act (the 1997 termination of contract here and the 1996 tying-arrangement contract in <u>Varner</u>). The only difference is that here the subsequent action was "negative" (i.e., we <u>will not</u> budge from our 1997 decision not to contract with you), whereas in <u>Varner</u> the subsequent act was "affirmative" (i.e., we <u>will</u> enforce the tying arrangement). There is simply no reason why this difference should lead to a different analysis or result in applying the statute of limitations.

In Plaintiffs' view, every Blue Cross refusal to budge from its 1997 decision would constitute a new overt act restarting the statute. That, however, is not the law. In <u>David Orgell, Inc. v. Geary's Stores, Inc.</u>, 640 F.2d 936 (9th Cir. 1981), for example, the defendant first refused to deal with the plaintiff in 1965. It refused again in 1968 and then in 1976 and 1977, and plaintiff sued in 1978. The court agreed with the district court that "'each time [defendant] repeated its refusal, it was a reaffirmation of the

11

original decision not to deal with the plaintiff,'" not a new overt act that would extend the statute. 640 F.2d at 938.

Where the subsequent acts are merely reaffirmations of the initial decision, those acts are not new overt acts restarting the statute of limitations. See generally DXS, Inc. v. Siemens Medical Systems, Inc., 100 F.3d 462, 467-68 (6th Cir. 1996) ("Acts that simply reflect or implement a prior refusal to deal . . . do not restart the statute of limitations"; same is true of "mere reaffirmations" of previous actions). Indeed, the subsequent refusals to budge alleged by Plaintiffs, rather than constituting a new overt act, show that the 1997 decision was final. To be sure, Plaintiffs argue the 1997 decision was not final because "Plaintiffs could have been let back in the network at any time, and in fact, sometimes were." (Opp'n at 17.) But the defendants in Varner could have chosen not to implement their tying arrangement, just as any party refusing to deal could change its mind. This exception, however, would swallow the principle that subsequent reaffirmations of refusals to deal are not new overt acts. And, as the Plaintiffs well know, their ultimate return to the network resulted not from Blue Cross's changing its mind about contracting with them but from a state any-willing-provider law mandating that Blue Cross contract with them.

In addition to Blue Cross's failure to budge from its 1997 termination, Plaintiffs' Opposition discusses several other purported overt acts within the limitations period. The first is Blue Cross's willingness to contract with Dr. Riberio when he was with a group other than Little Rock Cardiology Clinic (LRCC) but its refusal to re-contract with him in 2002 when he joined LRCC. Plaintiffs say that they cannot see "how Blue Cross's conduct in 2002 toward Dr. Riberio could possibly be a 'reaffirmation' of anything that

12

happened in 1997." (Opp'n at 16-17.) That should be obvious, based on Plaintiffs' own theory of the case and the allegations of the Amended Complaint. According to the Amended Complaint, LRCC and its physicians were the developers and owners of the heart hospital that Baptist allegedly attempted to injure (Am. Compl. ¶ 18) and the Blue Cross termination of LRCC and its physicians, Plaintiffs allege was part of that effort. So as part of its 1997 policy not to contract with the physicians involved with the heart hospital, Blue Cross would not contract with any member of LRCC. Blue Cross's refusal to contract with Dr. Riberio when he later joined LRCC simply reflected, and was a reaffirmation of, the earlier policy.

Next, Plaintiffs cite the 2003 action brought by Blue Cross against the Plaintiffs, arguing that "[u]nder long-standing Eighth Circuit precedent, these events [apparently the filing of the suit by Blue Cross] constitute an injurious act giving rise to a timely antitrust cause of action." (Opp'n at 17.) Plaintiffs cite no Eighth Circuit precedent, but even more important, the Amended Complaint does not even mention this alleged new overt act or that Baptist had any role in it.

Next, Plaintiffs claim that Baptist's adoption of the economic credentialing policy in 2003 constituted yet another other overt act restarting the statute. (Opp'n at 18-19.) As we explained in our previous memo (Baptist Mem. at 10), the Amended Complaint alleges only that the policy had the "potential" to injure Plaintiffs (Am. Compl. ¶ 27), not that it actually injured them. Plaintiffs filed suit in state court and enjoined its enforcement before they lost their privileges at Baptist. Plaintiffs' retort (although not alleged in the Amended Complaint) is that they were injured because of the "considerable costs" they expended in their state-court suit obtaining their injunction. (Opp'n at 19.)

13

Related to that, they argue that the injunction case <u>they</u> filed (in which Baptist was the <u>defendant</u>) itself constituted an additional overt act.

The injunction case cannot constitute a new overt act by Baptist because it did not file the suit; all it did was defend itself. Plaintiffs attempt to confuse the situation by arguing that "<u>Baptist's</u> 2004 litigation effort . . . was <u>itself</u> a new overt act that extended the statute of limitations." (<u>Id.</u>) (First emphasis added.) But as the Amended Complaint itself shows, that suit was not "Baptist's litigation effort," but rather Plaintiffs' litigation effort. (Am. Compl. ¶ 28.) In support of their argument, Plaintiffs cite only the Ninth Circuit's decision in <u>Pace Industries, Inc. v. Three Phoenix Co.</u>, 813 F.2d 234 (9th Cir. 1987). There, however, the defendant in the antitrust case was the party that filed the prior litigation, not the party defending itself when sued—the opposite situation of that here.

In support of their argument that the costs of their state-court injunction litigation constitute injury, Plaintiffs cite the Callman treatise, quoting a portion that states: "'When . . . a patent infringement suit is filed in pursuance of an unlawful plan of monopolization, injury has already occurred . . . .'" (Opp'n at 20.) That quotation is extremely misleading in the context of this case because the filing of a "sham" patent infringement suit <u>itself is</u> the violation. E.g., <u>In re Independent Serv. Orgs. Antitrust Litig.</u>, 203 F.3d 1322 (Fed. Cir. 2000). That is entirely different from the situation here, where Baptist was the defendant in the prior litigation, not the plaintiff, and the filing of the prior litigation is not itself the alleged antitrust violation.

There is some authority that a <u>defendant's</u> costs in defending a sham patent infringement suit that a plaintiff brought in bad faith (that is, knowing that its patent was

14

invalid or not infringed) constitutes antitrust injury. Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 997 (9th Cir. 1979). More recent decisions, however, reject even this view. Chip-Mender, Inc. v. Sherwin-Williams Co., 2006 WL 13058 at *5 (N.D. Cal. Jan. 3, 2006); Brotech Corp. v. White Eagle Int'l Techs. Group, Inc., 2004 WL 1427136 at *6 (E.D. Pa. June 21, 2004). Because the costs Plaintiffs may have incurred in bringing their injunction suit are not "injury" for antitrust purposes, the economic credentialing policy caused them no injury (and the Amended Complaint does not allege that it did) and thus this suit did not constitute a new overt act that restarted the statute of limitations.

In sum, Plaintiffs have alleged no new overt acts within the statute-of-limitations period, and thus their claims are time-barred.

## Conclusion

Regardless of what relevant product market the Plaintiffs allege, their claims fail because the Amended Complaint alleges no facts to support any allegation that they and Baptist are competitors in any relevant product market. And it is clear that the statute of limitations on their claims began running in 1997 and that they can allege no conduct by Baptist constituting new overt acts that would restart the statute. Accordingly, the Amended Complaint should be dismissed.

Respectfully submitted,

John J. Miles
William E. Berlin
Christi J. Braun
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
1401 H Street, N.W., Suite 500
Washington, D.C. 20005
(202) 408-8400
FAX: (202) 408-0640

And

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442


By _[signature]_
Gordon S. Rather, Jr. (68054)
Judy Simmons Henry (84069)
Troy A. Price (88010)
Michelle M. Kaemmerling (2001227)
Attorneys for Defendant Baptist Health

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

- Bryan G. Kolton – bgkolton@thejacobslawfirm.com

- Janet L. Pulliam - jpulliam@willliamsanderson.com

- John C. Everett – joh@everettfirm.com

- John G. Jacobs – jgjacobs@thejacobslawfirm.com

- Terry M. Gordon – tgordon@tgordonlaw.com

- Benjamin David Brenner – bbrenner@williamsanderson.com

_____
Gordon S. Rather, Jr.