IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

LITTLE ROCK CARDIOLOGY CLINIC, P.A.,
DR. BRUCE E. MURPHY and BRUCE E. MURPHY, M.D.P.A.,
DR. SCOTT L. BEAU and SCOTT L. BEAU, M.D.P.A.,
DR. DAVID C. BAUMAN and DAVID C. BAUMAN, M.D.P.A.,
DR. D. ANDREW HENRY and D. ANDREW HENRY, M.D.P.A.,
DR. DAVID M. MEGO and DAVID M. MEGO, M.D.P.A.,
DR. PAULO RIBEIRO and PAULO RIBEIRO, M.D.P.A., and
DR. WILLIAM A. ROLLEFSON and WILLIAM A. ROLLEFSON, M.D.P.A.

                                                                    **PLAINTIFFS**

vs.                          **No. 4-06-cv-1594-JLH**


BAPTIST HEALTH, ARKANSAS BLUE CROSS
AND BLUE SHIELD, USABLE CORPORATION,
BAPTIST MEDICAL SYSTEM HMO, INC.,
and HMO PARTNERS, INC.                              **DEFENDANTS**


## BAPTIST HEALTH'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Plaintiffs' Third Amended Complaint (Doc. 132) ("TAC") should be dismissed, this time with prejudice, for the same reason the Second Amended Complaint (Doc. 95) ("SAC") was dismissed and for several additional reasons as well. *First*, the TAC alleges exactly the same relevant product market that failed before, albeit in slightly different wording, a product market in which Baptist Health and Baptist Medical System HMO, Inc. (collectively "Baptist Health") do not compete. *Second*, although Plaintiffs now allege a relevant geographic market in more precise terms than before, in doing so they apply a legally invalid methodology that the Eighth Circuit and other courts have rejected. *Third*, Plaintiffs still fail to allege the

requisite market-wide adverse effect on competition in the relevant market they propose or in any other market. And *fourth*, the TAC itself shows that any recovery of damages is barred by the four-year statute of limitations of Section 4B of the Clayton Act, 15 U.S.C. § 15b.

## BACKGROUND

Counts I through IV of the TAC are, in substance, identical to the claims in Plaintiffs' three previous complaints dealing with various forms of physician services and hospital services. Each count challenges precisely the same alleged underlying conduct, merely by applying different antitrust labels: termination of Plaintiffs as providers of physician services for insureds using the Arkansas FirstSource provider network[1] and Baptist Health's Economic Conflict of Interest policy. Count I alleges a conspiracy between Baptist Health and Blue Cross to unreasonably restrain competition in some still-unclear health-care service market, in violation of Section 1 of the Sherman Act; Count II alleges a conspiracy to monopolize that market in violation of Section 2 of the Sherman Act; Count III alleges that Baptist Health attempted to monopolize that market in violation of Section 2; and Count IV alleges that Baptist Health actually monopolized that market in violation of Section 2.

Count V is completely new, alleging that Baptist Health and Blue Cross conspired to monopolize a market defined as (depending on which paragraph in Count V you read) the "market for private insurance" (TAC ¶ 222) or a market for "private insurance cardiology patients" (*id.* ¶ 226). Count VI alleges that Blue Cross attempted to monopolize whatever the Count V market is, and Count VII alleges that Blue Cross actually monopolized that market.

---

[1] Plaintiffs allege that Blue Cross and USAble Corp., a wholly-owned Blue Cross subsidiary, created the Arkansas FirstSource provider network for use by subscribers of all its managed-care products, including HMO Partners' Health Advantage HMO, and that it was Arkansas FirstSource from which Plaintiffs were terminated. (TAC ¶¶ 61-62.)

Baptist Health is not named as a defendant in Count VI or VII.  Count VIII, strangely, alleges no substantive violation but only requests permanent injunctive relief and thus warrants no discussion here.

At the February 27, 2008 hearing on Defendants' previous motions to dismiss, Plaintiffs, without hesitation, agreed with the Court that their alleged relevant product market was one comprised of "services offered by cardiologists." (Transcript of Motion Hearing, Feb. 27, 2008 ("Hr'g Tr.") at 25.) Everyone, including Plaintiffs, recognized that Baptist Health, as a matter of law, could not conspire to monopolize, attempt to monopolize, or monopolize a relevant market in which it does not even compete. (Hr'g Tr. at 42.) The Court told Plaintiffs explicitly that "you can't possibly prove that Baptist Health monopolized a market in which it does not compete." (*Id.* at 57.)

The Court also held that Plaintiffs failed to properly allege a relevant geographic market because their then-alleged "Central Arkansas" market was too nebulous to provide Defendants with notice of the market's scope. (*Id.* at 58.) Given these holdings, the Court did not need to reach Baptist Health's showing that Plaintiffs also failed to allege the requisite anticompetitive effects because competitive effects, if any, cannot be assessed absent a properly defined relevant market. The TAC does not cure any of these problems.

## THE TAC FAILS TO STATE A CLAIM

### I.  Baptist Health Is Not A Participant In Plaintiffs' Alleged Relevant Product Market

No one doubts the necessity, in antitrust cases, for a plaintiff to allege an explicit, understandable, and consistent definition of the relevant market—both a relevant product market and a relevant geographic market. *See generally Craftsman Limousine, Inc. v. Ford*

*Motor Co.*, 491 F.3d 380, 388 (8th Cir. 2007) (explaining that the "burden" in an antitrust case "begins with the task of properly defining the relevant market"). A relevant market consistent with a plaintiff's antitrust theory is essential for the case to make sense, to permit assessment of any effects on competition, and to determine whether that effect injured the plaintiff in a way that permits relief. More practically, a defendant cannot begin to conduct its discovery and analysis without a clear delineation and explanation by the plaintiff of the relevant market it claims was monopolized and in which it claims competition was unreasonably restrained by the defendant's alleged conduct. Courts do not permit a plaintiff to force a defendant to guess at the product market a plaintiff is alleging or shoot at a moving target. As one court in this circuit recently explained, "This moving target approach—were I to allow it—fails to give [defendant] proper notice of the claim against it." *Foam Supplies, Inc. v. Dow Chem. Co.*, 2007 WL 4210354 at *4 (E.D. Mo. Nov. 27, 2007).

In rejecting the Plaintiffs' alleged relevant product market at the February 27, 2008 hearing, the Court explained to the parties:

> As it is defined now . . ., the relevant product market has to be services offered by physicians, and that's what the complaint alleges . . ., that these are services offered by cardiologists and no defendant is a cardiologist and no defendant competes in that market. And so certainly counts 2, 3, and 4 fail . . . . I mean, you can't possibly prove that Baptist Health monopolized a market in which it does not compete, or attempted to monopolize a market in which it does not compete.

(Hr'g Tr. at 57.)

Notwithstanding the Court's explanation, indeed warning, to Plaintiffs that Baptist Health cannot, as a matter of law, monopolize, attempt to monopolize, or conspire to monopolize the cardiologist-services relevant product market alleged in the SAC, the TAC alleges the same product market again. In TAC paragraph 22, Plaintiffs explicitly define their

alleged relevant product market as *"medical services* that cardiology patients receive exclusively in a hospital *from a cardiologist."* (Emphasis added.) This definition, in substance, is identical to that of the SAC, "cardiology services for privately insured individuals that require the use of hospital facilities" (SAC ¶ 14), except that the TAC's definition includes all such patients, rather than only those who are privately insured.[2] According to the TAC, as in the SAC, the cardiologist is the supplier from whom the patient receives the relevant service; the hospital is merely the setting in which the service is provided. As before, Baptist Health is not a competitor in Plaintiffs' alleged relevant product market and thus cannot monopolize, attempt to monopolize, or conspire to monopolize it.

Paragraph 22's market definition, services provided by cardiologists, was no slip of Plaintiffs' pen. In paragraph 35, they allege that "[t]he first relevant product market at issue . . . (a market to be examined for competitive injury) is the market for *cardiology procedures* obtained in hospitals by patients covered by private insurance." (Emphasis added.) In paragraph 41, they claim that the relevant product market is *"medical procedures* that require

---

[2] The TAC ephemerally mentions other markets throughout, resulting in the "moving target approach" alluded to above and rendering the complaint incoherent. In addition to the definition above and insurance-related markets relevant to Counts V, VI, and VII, other markets to which the TAC alludes include "hospital services" (TAC ¶ 1); "market for cardiology patients" (*id.* ¶ 3); a conjoined market of "relevant cardiology services and hospital services" (*id.* ¶ 23); "market for cardiology procedures obtained in hospitals by patients covered by private insurance" (*id.* ¶ 35); "general hospital services market" (*id.* ¶ 38); "medical procedures that require hospital services" (*id.* ¶ 41); "market for hospital services for cardiology patients" (*id.* ¶ 171); "hospital market for cardiology services" (*id.* ¶ 172); "market for hospital services for cardiology patients covered by private insurance" (*id.* ¶ 196); and "Cardiology Procedures" in the headings of Counts II, III, and IV.

No two of these definitions are identical, and it is impossible to point out all the shortcomings of Plaintiffs' allegations (or lack thereof) regarding each of these markets without this memorandum becoming a book. For example, Plaintiffs define their alleged product market, first, as medical services provided by cardiologists that must be provided in a hospital. (TAC ¶ 22.) But in paragraph 35, they constrict that market to include only such patients covered by private insurance, and, at the same time, expand the market to include all cardiology procedures provided in hospitals regardless of whether the procedures must be done in hospitals or just happen to be done there. Later, they claim that *they* were excluded "from the market for *hospital* services (*id.* ¶ 106), although they never provided hospital services. Product-market definition in the TAC resembles a semantic shell game and "whack-a-mole" exercise, in which Baptist Health, first, must guess which shell the Plaintiffs' real market definition is under, and after Baptist Health shows that this product-market definition is implausible, another appears.

hospital services." (Emphasis added.) And they repeat, time and time again, that their complaint is that *they* were excluded from competing "in the market for privately insured cardiology patients." (TAC ¶¶ 145,198, 206, 213, 219.) Accordingly, the TAC alleges a product market of services provided by Plaintiffs and not provided by Baptist Health, although precisely what that product market includes remains anyone's guess.

Plaintiffs seem to recognize their "Baptist-Health-can't-monopolize-that-market" conundrum because they attempt to avoid it by spinning two somewhat creative arguments that they and Baptist Health are competitors in the same relevant product market. Both arguments, however, only confuse the issue further.

*First*, they claim that Baptist Health and that Plaintiff's group practice known as Little Rock Cardiology Clinic ("LRCC") are competitors because LRCC has a catheterization lab that, Plaintiffs claim, "competes directly with area hospitals." (TAC ¶ 16.) The problem with this argument is that, based on their own very emphatic product-market allegations, cardiologist services provided in a non-hospital setting, such as a physician-office cath lab, are not within their own alleged relevant product market. (*See id.* ¶ 20 ("If the cardiologist could provide the service outside of a hospital, then the service would be *outside* of the relevant product market."); ¶ 22 (limiting relevant product market to services received "*exclusively in a hospital* from a cardiologist") (emphases added).) There is no allegation, nor could there be, that the LRCC cath lab is a "hospital." If services rendered in a non-hospital setting, such as the LRCC cath lab, are not in the alleged product market, then, by definition, Baptist Health and LRCC (and, of course, the individual physician plaintiffs) are not competitors for purposes of this case.

*Second*, Plaintiffs claim that because "patients obtain . . . cardiology services only in conjunction with . . . hospital services," the services of cardiologists and those of hospitals "are not distinct products for purposes of antitrust analysis." (TAC ¶ 23.) Then, they add that because Plaintiffs, as cardiologists, "collaborate" with Arkansas Heart Hospital ("AHH") and other cardiologists collaborate with Baptist Health, Plaintiffs and Baptist Health are competitors. (TAC ¶ 24.) The argument appears to be that because hospital services and cardiologist services are sometimes provided together, there is a single product market consisting of both cardiologist services and hospital services. Plaintiffs dubbed these "conjoined products," when they made (and the Court apparently rejected) the same argument at the February 27, 2008 hearing. (Hr'g Tr. at 24.)

That two products are used together, or are economic "complements," does not suggest that they constitute a single relevant product market for antitrust purposes. The very Supreme Court decision that Plaintiffs cite for their contrary argument proves the point. *Jefferson Parish Hosp. Dist. v. Hyde*, 466 U.S. 2 (1984) (cited by Plaintiffs at TAC ¶ 23). There, the Supreme Court held specifically that hospital facilities used for surgery and physician-anesthesiologist services provided during surgery were separate services, explicitly rejecting the view that the hospital was selling "a functionally integrated package of services." 466 U.S. at 19. Numerous other decisions hold the same. *E.g.*, *Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1264 (10th Cir. 2006) ("'the mere fact that two items are complements, that one . . . is useless without the other does not make them a single product'") (alteration in original; internal quotation marks omitted) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 86 (D.C. Cir. 2001) (en banc)); *Konik v. Champlain Valley Physicians*

*Hosp. & Med. Ctr.*, 733 F.2d 1007, 1017 (2d Cir. 1984) (holding that hospital operating-room facilities and physician anesthesiology services are separate products).

The services Plaintiffs offer and those Baptist Health offers are economic complements when provided together, just as the services of the hospital and the   anesthesiologist were in *Jefferson Parish*. Two services are part of the same relevant product market, however, when they are *substitutes*—that is, when they exhibit significant positive cross-elasticity of demand in that the quantity demanded of one increases when the price of the other increases. *E.g., HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547-48 (8th Cir. 2007). *Complements* are precisely the opposite: two products are complements when their cross-elasticity of demand is negative—when the quantity demanded of one decreases when the price of the other increases.[3] As the leading antitrust commentators explain in discussing the relationship of substitutes and complements in defining relevant product markets, "It should be clear that a relevant market consists only of goods that are reasonably close *substitutes* for one another." IIB Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 565 at 405 (3d ed. 2007) (emphasis in original) ("*Antitrust Law*"). Indeed, the authors emphasize that "[g]rouping complementary goods in the same market is . . . economic nonsense." *Id.* at 406.[4]

---

[3] *See generally* Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 115-116 (6th ed. 2005) ("[T]wo goods are substitutes if an increase in the price of one leads to an increase in the quantity demanded of the other. . . . [T]wo goods are complements if an increase in the price of one good leads to a decrease in the quantity demanded of the other.").

[4] Other examples showing that complements are not a single product market and that their sellers are not competitors abound. Louisville Slugger sells baseball bats, and Rawlings sells baseballs. The products are complements, but no one would seriously contend that baseballs and bats are part of the same relevant product market or that the companies are competitors, even if they collaborated in selling their different products. Likewise, Sunoco sells gasoline and Michelin sells tires, yet those products are not part of the same relevant product market and the companies are not competitors, even though the products are complements. *See, e.g., Antitrust Law* ¶ 565 at 406 ("[T]he driver does need both gasoline and tires, but that hardly suggests that there is a gasoline/tire market.").

The key transcendent factor, which Plaintiffs acknowledge is true here, is that hospitals and physicians sell their individual services to health insurers and patients separately, not as a package. *See, e.g.*, *Park v. Thomson Corp.*, 2007 WL 119461 at *3 (S.D.N.Y. Jan. 11, 2007) ("Where the items have been sold separately, distinct products exist.") As the TAC itself explains, customers of Plaintiffs and Baptist Health—health plans or patients—"pay separately for the technical, or facility fee, which is for the services of the hospital . . ., and for the professional, or physician fee." In *Jefferson Parish*, the Supreme Court pointed to the same fact in holding that physician services and hospital services are separate services. 466 U.S. at 22. These are the "'technical component' and the 'professional component' of reimbursement payments." (TAC ¶ 18.)   Health plans contract separately with hospitals for hospital services and with physicians for physician services; physicians compete against physicians, and hospitals compete against hospitals. There is no allegation here, nor could there be, that hospitals package their services with physician services and sell those services in a single transaction at a single price in competition with other hospitals doing the same.

Thus, Plaintiffs' allegation that they "collaborate" with AHH and that other cardiologists collaborate with Baptist Health (TAC ¶ 24) is irrelevant to whether hospital services and Plaintiffs' cardiologist services are a single product and thus components of a single "conjoined" relevant product market. There is no allegation, nor could there be, that Plaintiffs plus AHH, and other cardiologists plus Baptist Health, go to health plans and, in competition with each other, offer them a single price for a package of hospital services and cardiologist services. Rather, competition is among physicians for the "professional component" of the services (e.g., inserting a pacemaker) and among hospitals for the "facility

component" (i.e., providing the facilities and ancillary staff where the physician performs the procedure).

A final, but separate and additional, problem with the TAC's alleged product-market definition is that, as a matter of law, it cannot be limited to cardiologist services "*receive[d] exclusively in a hospital.*" (TAC ¶ 22.) Nor can it be limited to privately insured patients as Plaintiffs attempt to do elsewhere in the TAC. (*Id.* ¶ 35.) Rather, the product market must include *all* cardiology services rendered by the Plaintiffs and other cardiologists, regardless of the type of service, where the service is rendered, or who pays for it (the government, a commercial insurer, or the patient). Plaintiffs' claim is that their termination by Blue Cross foreclosed them from providing cardiologist services to certain Blue Cross subscribers. The potential antitrust concern, if any, is that their foreclosure might so weaken them that they are forced from the market or lose their competitive viability. Depending on the remaining degree of competition among cardiologists if this were to occur (and on other factors), the ultimate effect could be unreasonably anticompetitive because this might cause prices for cardiologist services to rise. But the effect on Plaintiffs as competitors, and thus the *possible* effect on the relevant market as a whole and thus market-wide competition, depends on the degree of their foreclosure from *all* sources of revenue, not just revenue generated from cardiologist services provided at a hospital or from patients covered by private insurance. As the leading commentators have explained, when the antitrust claim is, as here, market foreclosure,

> [t]he relevant market for this purpose includes the full range of selling opportunities reasonably open to rivals, namely *all* the products and geographic sales they may readily compete for . . . . The foreclosure resulting from a vertical merger (or other arrangement) is thus measured in a market including the *total* output of sellers . . . .

*Antitrust Law* ¶ 579b1 at 418 (emphases added).   Accordingly, the relevant product market

must include *all* Plaintiffs' sources of patients.

For example, in *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d

57 (1ˢᵗ Cir. 2004), where Blue Cross excluded the plaintiff pharmacies from its pharmacy

network, the court rejected plaintiffs' claim that the relevant product market was limited to the

sale of pharmaceuticals to insured customers.   Rather, the court held that the product market

had to include sales of prescription drugs to *all* potential customers because the effect on

competition from the exclusion depended in part on the degree to which all sales were

foreclosed.   Fully applicable here, the court explained:

> Unfortunately for [plaintiffs' expert's] market definition, the concern in an ordinary
> exclusive dealing claim by a shut-out supplier is with the available market *for the*
> *supplier*.   Here, for [plaintiffs], their potential customers are presumptively *all* retail
> customers for prescription drugs—not just that smaller sub-group who are insured or
> reimbursed.   To say that some sub-group of customers is foreclosed proves nothing by
> itself about the impact on pharmacies.

373 F.3d at 67 (emphasis in original).

Here, similarly, the universe of Plaintiffs' potential customers includes *all* cardiology

patients, not just those obtaining Plaintiffs' services in hospitals or those insured by a private

insurer.   And it must include *all* the cardiologist services that Plaintiffs provide, not just

"interventional cardiology heart procedures," as Plaintiffs seem to suggest in TAC

paragraph 17.

In *Stop & Shop*, for  example, had the plaintiff pharmacy providers attempted to limit

the product market to pharmaceuticals sold to hospital patients (as Plaintiffs attempt to do here)

as well as only insured customers, the court certainly would have rejected the argument based

on this same logic.   And it would have done the same had the plaintiffs attempted to limit the

product market to only some, but not all, the drugs that plaintiffs sold. *See also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513-14 (3d Cir. 1998) (rejecting plaintiff's argument that relevant product market could be limited to defendant-HMO's insureds because "members of other prescription plans, or uninsured persons [are] completely interchangeable with [defendant's] members"); *B&H Med., L.L.C. v. ABP Admin.*, No. 02-73615, slip op. at 19-24 (E.D. Mich. Oct. 29, 2004) (copy attached as Appendix A) (holding that the relevant product market could not be limited to insured customers because plaintiff supplier of durable-medical equipment who was excluded from defendant's provider network "would be pleased to make sales to any individual who arrived at [its] doorstep, regardless of whether this individual is covered by an . . . insurance plan"; rather, market included "all purchases" by patients), *aff'd*, ___ F.3d ___, 2008 WL 1958393 (6th Cir. May 7, 2008) (noting district court decision was "well-reasoned").

In short, the TAC's product-market allegations are no more than a rehash of those in the dismissed SAC and an implausibly narrow market, and so the TAC's Counts I through IV should be dismissed.

**II.    Plaintiffs Fail To Allege A Plausible Relevant Geographic Market**

Oddly and without explanation, Plaintiffs' alleged relevant geographic market continues to shrink from complaint to complaint. The original and first amended complaints alleged a geographic market including sixteen counties surrounding Little Rock. Later, the SAC alleged a geographic market consisting of "Central Arkansas," which the Plaintiffs claimed "narrow[ed] the scope of inquiry." (Doc. 126, Plaintiffs' Response to Motions to Dismiss By All Parties at 23 (Feb. 8, 2008)).

Now the TAC claims that the relevant geographic market—for both Plaintiffs' alleged "cardiology procedures" and "private health insurance" relevant product markets—is limited only to the cities of Little Rock and North Little Rock. (TAC ¶ 39.) This alleged relevant geographic market, as a matter of law, is implausible for at least three reasons.

*First*, because every relevant product market has its own, distinct relevant geographic market, only by the purest of coincidences, with a probability approaching zero, would cardiology procedures and health insurance have relevant geographic markets of identical sizes. For example, the relevant geographic market for primary and secondary hospital services is smaller than that for more complicated tertiary hospital services. *See, e.g., United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 141 (E.D.N.Y. 1997). In this case, it might be true that Little Rock residents would not travel to California for a cardiology procedure (although, according to TAC paragraph 44, they might go to Cleveland, Houston, New York, or Chicago), but nothing prevents a Little Rock employer from purchasing health insurance from an insurer with headquarters in California, as long as the company is licensed in Arkansas.

*Second*, Plaintiffs wholly neglect to provide any factual support for any relevant geographic market for their claims concerning any insurance market, including Count V's conspiracy-to-monopolize claim against Baptist Health. Instead, they simply graft their alleged geographic market for cardiologist services onto a geographic market for insurance without any legal, logical, or economic rationale for doing so.

*Third*, and most important, Plaintiffs commit a major and determinative legal error by applying an invalid methodology for defining any relevant geographic market. Indeed, under

Plaintiffs' methodology, they could delineate almost any area they want as the relevant geographic market. Here, they chose an implausibly narrow market. As one court in this circuit explained, however, "courts have not hesitated to dismiss antitrust claims where it is clear that the alleged relevant market is too narrow [or] implausible." *Ferguson Med. Group, L.P. v. Mo. Delta Med. Ctr.*, 2006 WL 2225454 at *3 (E.D. Mo. Aug. 2, 2006). And the Eighth Circuit has not hesitated to affirm Rule 12(b)(6) dismissals in antitrust cases for failure to allege a "valid relevant market" because the "stated geographic market is too narrow." *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998). No court has accepted or applied the market-definition methodology used by Plaintiffs here, and it is invalid as a matter of law.

Plaintiffs' geographic-market-definition methodology is simply to pick out of thin air any arbitrarily chosen small area (here, Little Rock and North Little Rock) and dub that area a relevant geographic market if a large percentage of patients residing in that area use providers in that area. (TAC ¶¶ 45-47.) Thus, according to Plaintiffs, if a large percentage of patients in an area use hospitals in that area, the area, *ipso facto*, is a relevant geographic market. Based on that methodology, however, Plaintiffs could have alleged that the relevant geographic market is the area within a half-mile radius of the Baptist Health hospital in Little Rock (or an even smaller area) because a large percentage of patients in that area likely will use a Little Rock hospital. Or Plaintiffs could have picked Pulaski County, Pulaski and adjacent counties, or even the entire state of Arkansas and perhaps beyond if a large percentage of patients in those areas patronized Little Rock hospitals. This is not how courts define relevant geographic markets in antitrust cases.

The classic definition of a relevant geographic market comes from the Supreme Court's decision in *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961): "the market area in which *the seller operates*, and to which the *purchaser can practicably turn* for supplies." (Emphasis added.) *See also Double D Spotting*, 136 F.3d at 560 (relevant geographic market "includes the geographic area in which consumers can practically seek alternative sources of the product and it can be defined as 'the market area in which the seller operates'"); *Calabrese v. St. Mary's*, 2007 WL 518912 at *2 (E.D. Mich. Feb. 15, 2007). The logic of the *Tampa Electric* principle is that the relevant "purchaser[s]" in the second clause are all of those residing in the area "in which the seller operates," not just those residing in any arbitrarily chosen smaller sub-area where a large percentage of area patients use the providers in question.

In following *Tampa Electric*, courts apply a well-developed methodology for defining relevant geographic markets, particularly in antitrust cases involving health-care providers. The first step is to delineate the "area in which the seller operates." This is its service area, i.e., the area from which it draws the vast majority of its patients. *See, e.g., FTC v. Freeman Hosp.*, 69 F.3d 260, 264 (8th Cir. 1995) (explaining that the "first prong of the test . . . requires a determination of the [defendants'] 'service area,' the area from which they attract their patients"); *see also Doctor's Hosp. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 312 (5th Cir. 1997) ("condemn[ing]" plaintiff hospital's designation of the relevant geographic market in part because "30 percent of patients at [plaintiff hospital] . . . reside outside the plaintiff's proposed geographic market"); *Surgical Care Ctr. v. Hosp. Serv. Dist. No. 1*, 2001 WL 8586 at *5 (E.D. La. Jan. 3, 2001) (explaining that the first step is to "determine the . . . service

area in which [defendant] attracts the substantial majority of its inpatient business"), *aff'd*, 309 F.3d 836 (5th Cir. 2002). In defining the service area, courts use a ninety-percent threshold— i.e., a health-care provider's service area is the geographical area from which it draws at least ninety percent of its patients. *See, e.g., FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1048 n.4 (8th Cir. 1999) ("A 'service area' is generally defined as the area from which a hospital derives ninety percent of its inpatients."); *Kochert v. Greater Lafayette Health Servs., Inc.*, 372 F. Supp.2d 509, 517 (N.D. Ind. 2004) (80% insufficient); *Cal. v. Sutter Health Sys.*, 84 F. Supp.2d 1057, 1070 (N.D. Cal. 2000) (85% insufficient), *aff'd mem.*, 217 F.3d 846 (9th Cir. 2000), *amended on other grounds*, 130 F. Supp.2d 1109, 1122 (N.D. Cal. 2001) (same).

Nothing in the TAC even mentions the service areas of Little Rock cardiologists or hospitals. Ironically, the only alleged facts relating to the service-area question clearly indicate why the relevant geographic market cannot plausibly be limited to Little Rock and North Little Rock. Plaintiffs explain that "Little Rock hospitals attract patients in large numbers from outside Little Rock for cardiology procedures." (TAC ¶ 43.) Likewise, paragraph 49 explains that Little Rock hospitals serve "large numbers of patients from around the state for medical procedures that require hospital services." Paragraph 51 adds that Little Rock hospitals serve "a large percentage of residents from around the state." If Plaintiffs are correct, the relevant geographic market must be substantially larger than Little Rock and North Little Rock.[5]

---

[5] Plaintiffs also base their geographic-market definition, in part, on the fact that most cardiologists are located in Little Rock. But the relevant question with regard to the first step of the analysis is not where the service providers are located, but the "area in which the seller operates," which is the area from which they draw patients. Plaintiffs explicitly allege that cardiologists in Little Rock "draw[] large numbers of patients from around the state for medical procedures that require hospital services." (TAC ¶ 49.) They also allege that they receive patient referrals "from primary care doctors around the state." (*Id.* ¶ 153.) Finally, they discuss one doctor 120 miles from Little Rock in El Dorado who referred patients to both Baptist Health and AHH. (TAC ¶ 161.) All these allegations belie Plaintiffs' claim that the relevant geographic market is as small as Little Rock and North Little Rock.

Plaintiffs are correct that the "relevant geographic market . . . is not defined by the service area . . . of the parties" but that "the geographic area in which consumers can obtain reasonable substitutes for the relevant product or service" must be identified. (TAC ¶ 40.) Thus, the second step in defining a geographic market is identification of the geographic areas, and the providers in those areas, to which service-area patients could turn if the providers in the service area increased prices anticompetitively. *See, e.g.*, *Tenet Health Care*, 186 F.3d at 1052. Implementing this second step is obviously impossible, however, without first delineating the relevant service area. The TAC makes no effort to do so, a fatal mistake. If a plaintiff, as here, fails to delineate the service area, or if it delineates the service area incorrectly, it follows automatically that the plaintiff's relevant geographic market is incorrect as a matter of law. Here, Plaintiffs simply ignored the Eight Circuit's *Freeman Hospital* mandate to begin the market-definition process by delineating the relevant service area. Accordingly, Counts I through IV should be dismissed.

Count V, alleging that Baptist Health conspired to monopolize the "market for private insurance" (TAC ¶ 222) or the market for "private insurance cardiology patients" (*id.* ¶ 226), depending on which paragraph you read, should be dismissed for the same reason. Nothing in the TAC even hints at the scope of the service area of health insurers serving customers located in Little Rock or North Little Rock or of the extent to which customers in Little Rock could turn to insurers elsewhere for health insurance.

### III.    Plaintiffs Fail To Allege The Requisite Anticompetitive Effects In The Relevant Market

The crux of any antitrust complaint is a plausible allegation that the challenged conduct had the requisite substantially adverse market-wide effects on competition in the relevant

market, together with a plausible explanation of how the challenged conduct caused that effect. The SAC failed to provide the necessary allegations, and, for at least four reasons, so does the TAC.

*First*, market-wide competitive effects cannot be assessed absent plausible (and consistent) definitions of the relevant product and geographic markets. *E.g.*, *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of that market there is no way to measure [defendant's] ability to lessen or destroy competition."). The previous analyses show the absence of plausible market definitions here.

*Second*, Plaintiffs fail to allege the requisite, or any, adverse effects on competition in their purported relevant product market, "medical services that cardiology patients receive exclusively in a hospital from a cardiologist." (TAC ¶ 22.) To do so, they must plead, first, facts sufficient to plausibly show that their alleged exclusion will force them to exit the market or at least prevent them from continuing as viable competitors. *See, e.g., Doctor's Hosp. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 311 (5th Cir. 1997) (holding there was no effect on competition where plaintiff provider was excluded from a network but failed to show that its "exclusion . . . substantially affected its long-term viability as a competitor"). Second, they must plead facts plausibly showing that their exclusion from the market, if it occurred, would result in too few remaining competitors for a competitive market. Otherwise, they might allege injury to themselves but not to market-wide competition, but an antitrust violation requires the latter. *E.g. Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001).

Here, Plaintiffs allege neither element. As to the first, the TAC shows that Plaintiffs have not been excluded from "competing for privately insured cardiology patients" as they

repeatedly claim.  (TAC ¶¶ 198, 206, 213, 219, 226, 234, 240.)  Rather, they concede that they were prevented from treating only certain Blue Cross and HMO Partners' subscribers, and the relevant market is not limited to those patients.  (TAC ¶¶ 3, 13 (alleging Defendants conspired "unlawfully to exclude plaintiffs from access to cardiology patients covered by BCBS and HMO Partners Health Plans and to attempt to exclude plaintiffs . . . from the hospital facilities of Baptist Health").)[6]  In addition it includes subscribers to other health plans and, as explained above, all other cardiology patients capable of generating revenues for Plaintiffs.  Thus, Plaintiffs allege harm only to themselves, not any unreasonable restraint on market-wide competition for cardiology patients or anyone or anything else.  The TAC alleges nothing at all about the Plaintiffs' competitive viability, so the analysis need go no further.

Just to close the circle, however, Plaintiffs make no allegations to plausibly meet the second requirement.  Although they provide much purported Blue Cross market-share information, a large Blue Cross market share would not suggest injury to market-wide competition.  As one court put it, "The consumer does not care how many sellers of a particular good or service there are; he cares only that there be enough to assure him a competitive price and quality."  *Anesthesia Advantage, Inc. v. Metz Group*, 759 F. Supp. 638, 648 (D. Colo. 1991) (inside quotation marks and citation omitted); *see also Davies v. Genesis Med. Ctr.*, 994 F. Supp. 1078, 1097 (S.D. Iowa 1998) ("to injure or destroy one or two competitors . . . will not, if the market has many competitors, substantially affect consumers or anyone else besides the competitors themselves").

---

[6] The TAC contains no allegations that Baptist Health's "attempt" to exclude Plaintiffs from its facilities through its Economic Conflict of Interest policy had any effect on competition, so we do not discuss the policy here.

Thus, even were Blue Cross's market share 100 percent, the same conclusion would follow. Rather, the important question is whether, even if Plaintiffs were entirely excluded from the market (which the TAC shows they were not), sufficient competition among cardiologists would remain. The answer is not a function of Blue Cross or Baptist Health market shares but of the existence and competitive strength of competing cardiologists. To take an exaggerated example, if there were 100 cardiologists in the market, the loss of one would not even dent the market. Plaintiffs in fact, claim that their exclusion from Blue Cross resulted in steerage to other cardiologists (TAC ¶ 134-35), which acknowledges the existence of competitive alternatives.

*Third*, Plaintiffs cannot evade this "no-effect-in-their-cardiologist-product-market" problem by returning to their product-market shell game and alluding to yet another market they call, inconsistently, "the market for hospital services for cardiology patients covered by private insurance" (TAC ¶¶ 196, 201, 209, 216), the market for "hospital services for cardiology patients" (apparently whether covered or not by insurance) (*id.* ¶ 218), and the market for "privately insured cardiology patients" (apparently whether those patients are treated in the hospital or not) (*id.* ¶¶ 198, 206, 213, 219). Plaintiffs' argument is apparently that Baptist Health's alleged market power in this market (whatever the market is) results in supracompetitive prices and sub-competitive quality. But this argument fails as well.

As an initial matter, these new market definitions are completely inconsistent with the explicit product-market definition in the TAC paragraphs alleging and describing the relevant product market on which Counts I through IV depend, "medical services . . . from a cardiologist." (TAC ¶22.) It is *this* product market that Plaintiffs claim is the market that

should "be examined for competitive injury." (*id.* ¶ 35.) Elsewhere, the TAC does allude to a "hospital services market in general" (whatever that is) as merely "a subject of inquiry" (whatever that means) but explains that "plaintiffs do not assert distinct injury in this market." (*Id.* ¶ 38.)

Moreover, as explained next, even if consumers paid higher prices for substandard care at Baptist Health, they would not do so because of any Baptist Health antitrust market power, but because they voluntarily chose a health plan with a narrow network with Baptist Health as its primary local hospital. Consumers or employers may have chosen this health plan because they preferred Baptist Health as the TAC suggests (*see, e.g.*, TAC ¶¶ 107), or for other reasons; it does not matter. The salient antitrust point is that nothing Baptist Health can do would prevent them or their employers from choosing some allegedly lower-cost hospital by choosing another health plan with that hospital in its network.

Prior to the effective date of Arkansas's any-willing-provider statute, as the TAC notes (*see, e.g.*, TAC ¶¶ 53-58), HMOs and PPOs engaged in selective contracting—i.e., they did not contract with all providers wishing to join their network but offered a narrower provider network. Thus, when a health-plan subscriber or employer chose a health plan, it was also choosing the providers who would render care. If a subscriber preferred a particular provider (e.g., Plaintiffs or St. Vincent Infirmary), he or she could choose a health plan including Plaintiffs or St. Vincent in its network.

There is no allegation, nor could there be, that any health plan could force anyone to choose it for health insurance or that Baptist Health could force anyone to choose it for hospital services. Any "power" that Baptist Health could exercise over patients would result not from

any "market power" in the antitrust sense, but from "contract power"—that the person or employer voluntarily chose a health plan that contracted with Baptist Health but not, for example, St. Vincent, for hospital services. By choosing and contracting with that health plan, the subscriber, voluntarily and in effect, contracted with Baptist Health for hospital services.[7] Again, nothing in the TAC suggests that if subscribers or their employers became dissatisfied with the cost or quality of either Blue Cross or Baptist Health, they could not change health plans to escape this "power."

*Fourth*, the TAC never explains the mechanism by which any harm to competition in any hospital-product market (whatever it is) occurred—i.e., the connection or causation element between Baptist Health's alleged unlawful conduct and the alleged anticompetitive effects. The gravamen of Plaintiffs' complaint, and the cause of their alleged injury, is their termination, as providers of physician services, from the Arkansas FirstSource provider network ("FirstSource"), which was created, so Plaintiffs allege, for Blue Cross and HMO Partners' subscribers. (TAC ¶¶ 61-62; *see also id.* ¶¶ 132, 135 (alleging that Plaintiffs were terminated to protect Baptist Health from Arkansas Heart Hospital ("AHH") competition).)

---

[7] This "contract power" scenario is the frequent subject of failed antitrust challenges in the franchise context. Just as Blue Cross subscribers agree to contracts by which they will use Baptist Health for hospital services, Burger King might enter into franchise agreements with a its franchisees requiring them to purchase all their supplies (cups, napkins, French fries, etc.) from a source it designates. Believing that the supplier is "ripping them off" on the prices of supplies, the franchisees may file an antitrust suit against Burger King and the supplier, alleging that the supplier has substantial market power and thus the franchise agreement or supply agreement unreasonably restrains competition.

The courts have uniformly rejected these claims, explaining that the adverse effect on the franchisees results not from antitrust market power but from the franchise contract, which the franchisee knowingly and voluntarily entered. *See, e.g., Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.*, 520 F.3d 393, 407-08 (5th Cir. 2008) (distinguishing "contract power" from "market power"); *Westerfield v. Quizno's Franchise Co.*, 527 F. Supp.2d 840, 859 (E.D. Wis. 2007) ("It is true that after plaintiffs became Quizno's franchisees, Quiznos was able to exercise substantial power over them. . . . But this was due to the contractual provisions of the Franchise Agreement each of the plaintiffs signed, not Quizno's market power. This is not the kind of harm the Sherman Act was intended to prevent.").

The cause of any potential anticompetitive effect would have been AHH's inability to treat those subscribers.  Moreover, AHH is not a party to this litigation.

But AHH's inability to treat those subscribers did not result from termination of Plaintiffs' physician-service contracts.  AHH could not treat FirstSource subscribers because it had no hospital-service contract with FirstSource.  (TAC ¶ 133.)  AHH, without a hospital-service contract, would have been little better off had FirstSource contracted with Plaintiffs for physician services.  It would have been able to treat FirstSource subscribers only if they were willing to pay the cost of using an out-of-network hospital, and the Plaintiffs, themselves, claim that a "vast majority" of patients would have been unwilling to do so.  (*Id.* ¶ 57.)  AHH was unable to treat the vast majority of FirstSource subscribers regardless of whether Plaintiffs had retained their physician-service contracts.

As a result, termination of Plaintiffs' physician-service contracts caused little or no injury to AHH and thus little or no anticompetitive effect or antitrust injury.  *See In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (affirming Rule 12(b)(6) dismissal where the alleged adverse effect on competition resulted from a cause other than defendants' alleged unlawful conduct and thus "the alleged conduct of the defendants did not cause an injury of the type that the antitrust laws were designed to remedy").  If the allegedly unlawful conduct is not the cause of the injury to competition, that conduct cannot constitute an antitrust violation of either Section 1 or Section 2 of the Sherman Act:  "Because [plaintiffs] fail to establish that [defendant's] conduct harmed the competitive process under § 1, their conspiracy to monopolize claim under § 2 likewise fails." *Gregory v. Fort Bridger Rendevouz Ass'n*, 448 F.3d 1195, 1206 (10th Cir. 2006).

Accordingly, Counts I through IV should be dismissed on these grounds as well.[8]

## IV.   The Statute Of Limitations Precludes Any Recovery Of Damages

Section I of the Health Plan Defendants' memorandum in support of their motion to dismiss discusses, in detail, why the statute of limitations bars this action as to them. Because almost all of that analysis applies to Plaintiffs' claims against Baptist Health, Baptist Health incorporates that analysis herein by reference and will not repeat it.

There is one difference between the Health Plan Defendants' status and that of Baptist Health relevant to application of the statute of limitations. Baptist Health adopted its Economic Conflict of Interest policy, an alleged overt act of the alleged conspiracy, less than four years before Plaintiffs filed suit against it, while Plaintiffs filed suit against the Health Plan defendants more than four years after adoption of the policy.

That Baptist Health adopted the policy within the limitations period, however, does not change the result. Even assuming, for purposes here, that adoption of the policy was part of the conspiracy that Plaintiffs claim began in 1997, that act would not keep the limitations period running or restart it. The Eighth Circuit has stated clearly that the statute of limitations runs from the last overt act but, to constitute a requisite overt act, the act "must inflict new and accumulating injury on the plaintiff." *Varner v. Peterson Farms, Inc.*, 371 F.3d 1101, 1019 (8th Cir. 2004). Because, as Plaintiffs allege, the policy was never enforced as to them (TAC ¶ 154), it never prevented them from practicing at Baptist. As a result, it "inflicted [no] new and accumulating injury on" them or on competition. Accordingly, as in the case of the Health

---

[8] Section III of the Health Plan's Defendants' memorandum in support of their motion to dismiss explains that Plaintiffs lack antitrust standing to recover against them under Counts V, VI, and VII. The same analysis applies to Plaintiffs' Count V claim against Baptist Health. Baptist Health incorporates that analysis herein by reference and moves to dismiss Count V on that ground.

Plan Defendants, Plaintiffs filed their suit against Baptist Health more than four years after any act that injured them, and thus they are barred from recovering any damages by Section 4B of the Clayton Act.

## CONCLUSION

In *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955 (2007), the Supreme Court imposed a plausibility standard on pleading as the price for admission to discovery, in large part because of concern about the massive cost of modern federal antitrust litigation. 127 S.Ct. at 1966-67. Although *Twombly* was a class-action and this case is not, the same concern is fully warranted here. While hard to believe, Plaintiffs are claiming injury from an act—termination of their physician-service contracts—that occurred over eleven years ago. Making matters worse, Plaintiffs even complain about acts occurring well before that, such as the formation of HMO Partners in 1993 or 1994. (TAC ¶ 116.) Discovery reaching back this far will be terribly burdensome and massively expensive even if all the relevant information still exists—and this in a case in which Plaintiffs cannot even plead a proper relevant market, much less a plausible antitrust case. Baptist Health should not be made to run this gauntlet.

At the February 27, 2008 hearing, the Court gave Plaintiffs a last chance to state a claim, at least in part because their previous amended complaints did not result from a finding that the earlier complaints failed to state a claim. (Hr'g Tr. at 59.) Although Plaintiffs tried again, adding yet another level of pleadings and further complicating the case by adding four new counts, they still cannot state a claim.

Thus, in summary, the TAC should be dismissed for the following reasons:

1.  Count I should be dismissed because it fails to allege a plausible relevant product market; because it fails to allege a plausible relevant geographic market, regardless of the definition of the relevant product market; and because it alleges no facts suggesting any unreasonable effect on competition in the alleged relevant product market—"medical services that cardiology patients receive exclusively in a hospital from a cardiologist"—or any other relevant product market.

2.  Count II should be dismissed for the same reasons.  It also should be dismissed because Baptist Health is not a competitor in the alleged relevant market and thus cannot conspire to monopolize attempt to monopolize, or monopolize that market.

3.  Count III should be dismissed for the same reasons as Count II.

4.  Count IV should be dismissed for the same reasons as Count II.

5.  Count V should be dismissed because it fails to allege a plausible relevant geographic market and because Plaintiffs lack antitrust standing to bring the claim.

6.  Baptist Health is not a defendant in Counts VI and VII.

7.  Count VIII alleges no violation of any kind.

8.  Plaintiffs' claims for damages should be dismissed because the statute of limitations bars their claim.

For all these reasons, Baptist Health respectfully asks the Court to dismiss the TAC, in its entirely and with prejudice.

Respectfully submitted,

John J. Miles
William E. Berlin
Christi J. Braun
OBER, KALER, GRIMES & SHRIVER
1401 H Street, N.W., Suite 500
Washington, D.C. 20005
(202) 408-8400
FAX:  (202) 408-0640

and

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442

By _____
Gordon S. Rather, Jr. (68054)
Judy Simmons Henry (84069)
Troy A. Price (88010)
Michelle M. Kaemmerling (2001227)

Attorneys for Defendants Baptist Health and
Baptist Medical System HMO, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

Jess L. Askew, III
jaskew@williamsanderson.com

William E. Berlin
weberlin@ober.com

Christi J. Braun
cjbraun@ober.com

Benjamin David Brenner
bbrenner@williamsanderson.com

John C. Everett
john@everettfirm.com

Stephen Alexander Hester
shester@williamsanderson.com

Peter G. Kumpe
pkumpe@williamsanderson.com

John J. Miles
jjmiles@ober.com

Janet L. Pulliam
jpulliam@williamsanderson.com

Debra K. Brown
dbrown@shultslaw.com

Steven T. Shults
sshults@shultslaw.com

Mitchell D. Raup
MRaup@MayerBrown.com

Robert E. Bloch
RBloch@MayerBrown.com

Chet A. Roberts
cxroberts@arkbluecross.com

Thomas B. Staley
tstaley@rsmd.com

_____
Gordon S. Rather, Jr.

# APPENDIX A



## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

B&H MEDICAL, L.L.C.,

      Plaintiff,

v.

                               Case No. 02-73615
                               Hon. Gerald E. Rosen

ABP ADMINISTRATION, INC., and
WRIGHT & FILIPPIS, INC.,

      Defendants.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____**OCT 2 9 2004**_____

PRESENT:  Honorable Gerald E. Rosen
                  United States District Judge

## I. INTRODUCTION

In 1992, Defendant ABP Administration, Inc. ("ABP"), a wholly owned subsidiary

of Defendant Wright & Filippis, Inc. ("W&F"), entered into a contract with non-party

Blue Cross and Blue Shield of Michigan ("BCBSM") to administer an exclusive network

of preferred providers of durable medical equipment ("DME") and prosthetics and

orthotics ("P&O") for subscribers of certain health benefit plans offered to Chrysler

Corporation (now DaimlerChrysler) employees and retirees.  Under this so-called

"SUPPORT" contract, W&F served as the principal network provider of DME/P&O, and

ABP and BCBSM together made the decision as to which other DME/P&O vendors would be permitted to join the network. This SUPPORT program subsequently has been expanded to include certain employees and retirees of Ford Motor Company, as well as participants in the Michigan Public School Employees Retirement System ("MPSERS").

Plaintiff B&H Medical, L.L.C. ("B&H"), a DME supplier formed in April of 2001, commenced this suit on September 10, 2002, seeking to challenge its exclusion from the SUPPORT network of preferred providers of DME/P&O. According to the complaint, Defendant ABP briefly granted approval for B&H to join this network, but then revoked this status as a "mistake," allegedly "at the direction or behest of, or in conspiracy with," Defendant W&F and non-party BCBSM. (First Amended Complaint at ¶¶ 12-13.) Through this and similar exclusions, Plaintiff alleges that Defendants have restrained competition in the market for the sale, lease, or rental of DME/P&O, and that Defendants are seeking to monopolize this market. Based on these allegations, B&H has asserted antitrust claims against Defendants under sections 1 and 2 of the federal Sherman Act, 15 U.S.C. §§ 1, 2.

By motion dated December 4, 2003, Defendants now seeks an award of summary judgment in their favor on Plaintiff's various § 1 and § 2 theories of recovery. Among other contentions, Defendants argue: (i) that Plaintiff has failed as a matter of law to establish that the SUPPORT program has foreclosed out-of-network providers such as B&H from a substantial share of the market; (ii) that Plaintiff has failed to produce

2

evidence of concerted action between Defendants and non-party BCBSM that could

support a § 1 claim; (iii) that Defendants lack sufficient market power to sustain a viable

claim of monopolization or attempt to monopolize; and (iv) that Plaintiff has failed to

identify an injury to competition as a whole, as opposed to itself alone, that could support

a claim under federal antitrust law.

This motion has now been fully briefed on both sides.[1]  Having reviewed the

parties' submissions and the voluminous record presented in support of and opposition to

Defendants' motion, the Court has determined that oral argument would not significantly

aid the decisional process, and that it is appropriate to decide this motion "on the briefs."

See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.  This Opinion

and Order sets forth the Court's rulings on Defendants' motion.

## II.  FACTUAL BACKGROUND

**A.     The Parties and Other Relevant Entities**

Plaintiff B&H Medical, L.L.C. ("B&H") is a supplier of durable medical

equipment ("DME"), including oxygen-related equipment, beds, and walkers, as well as

some prosthetics and orthotics.  Plaintiff operates out of a business office, warehouse, and

---

[1]Plaintiff's initial response rested largely upon the contention that it could not meaningfully address the issues raised in Defendants' motion absent its (and, more importantly, its expert's) opportunity to review various documents sought from non-party BCBSM. Following its resolution of this discovery dispute, the Court granted both sides an opportunity to file a supplemental brief and supporting exhibits addressing the matters uncovered in this last round of discovery.  Both sides elected to take advantage of this offer, with Plaintiff filing a supplemental brief and expert's affidavit on April 21, 2004, and Defendants filing a supplemental reply and supplemental expert's affidavit on May 26, 2004.

showroom located within close proximity of each other in Livonia, Michigan. Plaintiff's

owner and operating manager is Harold Greenberg, who ran the business out of his home

as "more of a hobby than a business" until some point in 2000 or early 2001, (see

Defendant's Motion, Ex. 2, Greenberg Dep. at 65), when B&H was formed as a limited

liability company under Michigan law. Mr. Greenberg characterizes B&H as having

enjoyed "impressive" growth in the past few years, but as "still small when compared to"

its competitor, Defendant Wright & Filippis. (Plaintiff's Suppl. Br., Ex. 1, Greenberg

Aff. at ¶ 6.)

Defendant Wright & Filippis, Inc. ("W&F") is a Michigan corporation founded in

1944. W&F initially was a supplier of prosthetics and orthotics ("P&O") — that is,

artificial limbs and support devices for amputees and patients suffering from other

physical disabilities — but expanded its operations into DME in the late 1970s. W&F

now sells DME/P&O out of its headquarters in Rochester Hills, Michigan, 25 branch

offices in Michigan, and one branch office each in Ohio and Indiana.

In the early 1990s, W&F became interested in developing a new line of business,

consisting of the administrative services needed to form and operate a network of

DME/P&O providers and to process claims for DME/P&O supplied by this provider

network. Accordingly, Defendant ABP Administration, Inc. ("ABP") was formed as a

wholly-owned subsidiary of W&F in order to pursue this line of business.

In addition to these parties, non-party Blue Cross and Blue Shield of Michigan

4

("BCBSM") features heavily in the facts and allegations of this case.  BCBSM offers a

variety of health benefit plans, and also provides administrative services for companies

that elect to offer self-funded health care benefit plans to their employees and retirees.  Of

particular relevance here, BCBSM administers self-funded plans offered by the "Big

Three" automakers — General Motors, Ford, and DaimlerChrysler — as well as a health

benefit plan offered to retired schoolteachers who participate in the Michigan Public

School Employees Retirement System ("MPSERS").[2]

## B.   The Development of the SUPPORT Program

As of 1991, Chrysler Corporation offered its employees and retirees three types of

health benefit plans, each of which was administered by BCBSM.  Under the "traditional"

plan, a participant could seek health care services from a wide range of participating

providers, who then received payment from the plan on a fee-for-service basis established

under the terms of the plan.  The "preferred provider organization" ("PPO") plan operated

similarly, except that the designated pool of "preferred" providers agreed to accept a

discounted rate that was below the fee paid under the traditional plan.  Finally, BCBSM

administered a health maintenance organization ("HMO") plan, under which participants

---

[2]Plaintiff also refers occasionally to the Northwood/NPN ("NNPN") network, which apparently is the administrative counterpart to Defendant ABP for certain health benefit plans offered to General Motors employees and retirees.  Although the record somewhat unclear on this point, Plaintiff apparently alleges that the NNPN network is administered as a joint venture between Defendant W&F and one of its competitors, Binson's Home Health.  Neither Binson's nor NNPN has been named as a party, however, and Plaintiff's complaint does not specifically refer to either the NNPN network or any General Motors health benefit plans.

could obtain services only from a limited panel of providers included within the HMO.

In an effort to control escalating health care costs, Chrysler and its employees' principal bargaining representative, the UAW, formed a Joint Insurance Committee ("JIC") to explore various cost-saving measures. One such measure relied on "carve-outs," under which a specialized area of health care services is broken off from other benefits and handled through a single vendor. The SUPPORT program at issue in this case arose from this cost-saving effort, and entails the "carve-out" of DME/P&O services from other health care services offered under a benefit plan.

Specifically, BCBSM developed the SUPPORT program[3] as a means for its customers, including Chrysler, to offer DME/P&O benefits to their employees at a substantial discount from the DME/P&O costs incurred under their existing plans. Under this program, BCBSM selected an exclusive vendor through which the participants in traditional or PPO plans would obtain all DME/P&O services,[4] and which would be responsible for administering this aspect of the overall health benefit plan. To implement this program, BCBSM sent a Request for Proposal ("RFP") to various vendors, and Defendant W&F was one of the vendors that responded. Upon evaluating the proposals submitted in response to the RFP, W&F was selected as the exclusive vendor for the

---

[3]"SUPPORT" is an acronym for "Select Utilization of Providers for Prosthetic, Orthotic and Rehabilitative Technology."

[4]As explained by Defendants, HMO-based plans were excluded from the SUPPORT program because an HMO essentially is an across-the-board "carve-out," consisting of an exclusive set of providers for all health care services.

SUPPORT program.

Following this selection, BCBSM proposed to Chrysler and the JIC that the

SUPPORT program be adopted as part of Chrysler's health benefit plans for its

employees and retirees. Among other things, this proposal explained that the SUPPORT

program would achieve a cost savings to Chrysler's self-funded plans by charging a flat

"capitation rate" per enrolled plan member per month regardless of actual DME/P&O

usage, as opposed to a traditional fee-for-service rate methodology.[5] The proposal

emphasized, however, that plan participants would be charged an "out-of-network

sanction" for services obtained from a provider that was not a member of the SUPPORT

network.[6] By letter to BCBSM dated September 19, 1991, the JIC agreed to adopt the

SUPPORT program for all active or retired employees who were enrolled in either the

traditional or PPO plans, with a commencement date of January 1, 1992.

Following this notification, BCBSM and W&F negotiated the final terms of a

contract to implement the SUPPORT program. (See Defendant's Motion, Ex. 12, 1992

SUPPORT Contract.) Beyond the capitation and sanction provisions described above,

this contract conferred upon ABP and W&F the authority to enter into subcontracts with

---

[5]The proposal estimated that this "capitated arrangement" would result in a 22 percent
cost savings over the existing fee-for-service methodology, which "translates into $4,729,354
million in projected savings to Chrysler and the UAW over a two year period for DME/P&O
benefits." (Defendants' Motion, Ex. 7, Ruloff Aff., Ex. U, Sept. 1991 SUPPORT Proposal at 1.)

[6]This sanction was defined as 20 percent of the fee negotiated by W&F with the out-of-
network provider, up to a calendar-year maximum of $500 that a plan participant would have to
pay out of his or her own pocket for services from out-of-network vendors.

additional DME/P&O vendors, in order to ensure adequate coverage of plan participants

throughout the entire geographic region encompassed by the SUPPORT program.

BCBSM was granted a right of prior approval of each subcontractor, but promised not to

"unreasonably withhold" this approval. (Id. at § 2.1.)  According to W&F's president and

chief executive officer, Anthony Filippis, the goal in enlisting subcontractors was to

ensure that two network providers would be available to service each geographic region

within Michigan.  Initially, however, W&F identified five subcontractors which, together

with W&F's own branch offices, defined the universe of in-network providers available

to plan participants.

In Defendants' view, the exclusive nature of the SUPPORT network is a necessary

*quid pro quo* for their agreement to accept a flat capitation rate per enrolled member per

month, regardless of the actual demand for DME/P&O by plan participants.  To offset the

risk they assumed under this arrangement, Defendants contend that it was essential that

they be granted exclusive status and powers under the SUPPORT program, that they

control the admission of subcontractors into the provider network, and that the program

include a system of incentives and sanctions that would encourage participants to use in-

network providers.  Defendants maintain, for example, that they can control their costs,

and thereby ensure a profit under the capitation payment scheme, only if they can

negotiate discounts with subcontractors in exchange for the prospect of a higher volume

of business that flows from an exclusive provider network with limited membership.  For

its part, Plaintiff disputes this economic analysis, and further argues that any claimed

benefits of the SUPPORT program are legally irrelevant if, as Plaintiff maintains, this

program has an impermissible anticompetitive effect upon the relevant market for

DME/P&O.

## C.   The Expansion of the SUPPORT Program to Ford and MPSERS

According to Defendants, the SUPPORT program's success in its first two years

exceeded BCBSM's projections in its proposal to Chrysler — BCBSM had estimated that

Chrysler would save about $4.7 million over the two-year term of the contract, but a

September, 1994 evaluation indicated that the savings exceeded $5.8 million.  As a result,

Chrysler expanded its participation in the SUPPORT program to include all of its

employees nationwide, as opposed to its initial coverage of only Michigan employees.  In

addition, the SUPPORT contract with W&F was renewed in 1994 and again in 1997.

The SUPPORT program also has been adopted by Ford Motor Company and the

Michigan Public School Employees Retirement System ("MPSERS").  Ford, like

Chrysler, has elected to cover all of its employees throughout the country.  Ford's version

of the program, however, differs from Chrysler's in two respects.  First, for those Ford

employees who are enrolled in a "traditional" plan, versus a "PPO" plan, W&F is

compensated on a fee-for-service basis, as opposed to the capitation method used for

Chrysler and for Ford's PPO participants.  In addition, Ford's DME/P&O carve-out from

its "traditional" plan encompasses only hourly and not salaried workers.

9

**D.    The Exclusion of Plaintiff from the SUPPORT Network**

As a result of the expansion of the SUPPORT program to include Chrysler employees throughout the country, Ford employees, and individuals who receive health coverage through MPSERS, Defendants have significantly increased the network of subcontractors that provide DME/P&O to subscribers. In Michigan alone, there now are dozens of outlets, beyond Defendants' own locations, where SUPPORT program participants can obtain in-network products and services.

For a brief period, it appeared that B&H was among those providers that had been admitted into the expanded SUPPORT network. B&H's owner and operating manager, Harold Greenberg, states in his affidavit that the company applied for admission into the SUPPORT network at some point in 2000, and that this application was approved. Soon thereafter, however, Greenberg was informed that B&H's membership had been terminated, and that the company's admission into the network had been a "'mistake' because the ABP Network did not need another DME provider in the areas in which B&H did business." (Plaintiff's Suppl. Br., Ex. 1, Greenberg Aff. at ¶¶ 3-4.) This lawsuit followed, challenging the legality under federal antitrust law of the SUPPORT program's exclusive network of DME/P&O providers and Defendants' refusal to admit B&H as a member of this network.

10

# III. ANALYSIS

## A.    The Standards Governing Defendants' Motion

Through their present motion, Defendants seek summary judgment in their favor on each of Plaintiff's claims under §§ 1 and 2 of the Sherman Act. This motion is governed by the familiar standards of Federal Rule of Civil Procedure 56, under which summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases — Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505 (1986), and Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986) — ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[7] As explained in Celotex:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

_____

[7] "[T]aken together, these three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Procedure, § 2727, at 468 (1998) (footnote omitted).

Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.

In considering a defendant's motion for summary judgment, then, the question is "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented," and the "mere existence of a scintilla of evidence in support of the plaintiff's position" does not satisfy this test. Anderson, 477 U.S. at 252, 106 S. Ct. at 2512. When performing this inquiry, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." 477 U.S. at 255, 106 S. Ct. at 2513.

These same principles govern, of course, in suits brought under the Sherman Act. In fact, one of the Supreme Court's above-cited trilogy of summary judgment decisions, Matsushita, was itself an antitrust case. As in other complex fields, however, substantive antitrust law has placed a gloss upon the traditional standards for resolving a motion for summary judgment. Matsushita observes, for example, that "antitrust law limits the range of permissible inferences from ambiguous evidence," and the Court cautioned that mistaken inferences in antitrust cases can be "especially costly, because they chill the very conduct the antitrust laws are designed to protect." Matsushita, 475 U.S. at 588, 594, 106 S. Ct. at 1356, 1360. With these principles in mind, the Court turns to Defendants' motion.

**B.** **The Substantive Law Governing Plaintiff's Antitrust Claims**

Plaintiff B&H has advanced claims under both § 1 and § 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Although the exact contours of these claims often are frustratingly

unclear from Plaintiff's pleadings, briefs, and supporting exhibits, the law governing these claims is well settled as a general matter. First, to establish a violation of § 1, B&H must show "that the defendants combined or conspired with an intent to unreasonably restrain trade." Nurse Midwifery Associates v. Hibbett, 918 F.2d 605, 611 (6th Cir. 1990) (internal quotations and citation omitted); see also Chase v. Northwest Airlines Corp., 49 F. Supp.2d 553, 559 (E.D. Mich. 1999). Here, Plaintiff alleges that the SUPPORT program itself reflects an unlawful conspiracy among Defendants and BCBSM,[8] and perhaps others,[9] to exclude B&H from the market for the sale, lease, or rental of DME/P&O, and to thereby restrain trade and competition in this market.

Beyond these general elements of a § 1 claim, the courts have adopted more specific standards for analyzing the lawfulness of an exclusive dealing arrangement of the sort embodied in the SUPPORT program. The leading Supreme Court decision on the subject is Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S. Ct. 623 (1961), which involved an exclusive 20-year agreement by petitioner Tampa Electric to purchase

---

[8]As Defendants point out, the alleged combination must involve entities other than W&F and ABP, because a parent and its wholly owned subsidiary have a "complete unity of interest," and thus cannot form an unlawful agreement within the reach of § 1 of the Sherman Act. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771-74, 104 S. Ct. 2731, 2741-43 (1984).

[9]As noted earlier, while the initial pleadings are silent on the subject, Plaintiff has suggested in its more recent submissions that a conspiracy might exist among Defendants and Binson's Home Health, another DME/P&O vendor, to exclude B&H from the NNPN network that serves General Motors employees and retirees. As will become clear, any such additional conspiracy would not affect the disposition of Plaintiff's claims in this case.

all of the coal it would require to operate one of its power plants from the respondent coal companies. Just before this contract was to take effect, the coal companies expressed their view that the arrangement was illegal under antitrust law, and they refused to deliver any coal. Tampa Electric brought suit, seeking to enforce the terms of its agreement with the coal companies. The lower courts found that the contract would substantially restrain competition in the Florida market for coal, and thus declined to enforce it.

The Supreme Court reversed, finding that the lower courts had too narrowly defined the relevant geographic market within which the parties operated. In so ruling, the Court first emphasized that exclusive dealing arrangements are not *per se* unlawful, but instead must be evaluated in light of their effect upon competition in the relevant market. See Tampa Electric, 365 U.S. at 327, 333, 81 S. Ct. at 628, 631. The Supreme Court then articulated the standard for analyzing challenges to such arrangements, holding that "the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market." Tampa Electric, 365 U.S. at 328, 81 S. Ct. at 628. More specifically, the Court endorsed a set of factors governing this "substantial foreclosure" inquiry:

> To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

14

365 U.S. at 329, 81 S. Ct. at 629. As discussed at greater length below, this <u>Tampa Electric</u> standard has been applied in a number of cases involving exclusive dealing arrangements in the health care industry. <u>See</u>, <u>e.g.</u>, <u>Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island</u>, 373 F.3d 57, 62, 65-68 (1st Cir. 2004); <u>U.S. Healthcare, Inc. v. Healthsource, Inc.</u>, 986 F.2d 589, 595-97 (1st Cir. 1993); <u>Collins v. Associated Pathologists, Ltd.</u>, 844 F.2d 473, 478-79 (7th Cir. 1988).

Next, it appears that Plaintiff is pursuing two theories under § 2 of the Sherman Act, 15 U.S.C. § 2. First, B&H has asserted a claim of monopolization, under which it must show (i) that Defendants possess monopoly power in the relevant market, and (ii) that Defendants have willfully acquired, maintained, or used this power in an anticompetitive or exclusionary manner. <u>See</u> <u>Re/Max Int'l, Inc. v. Realty One, Inc.</u>, 173 F.3d 995, 1016 (6th Cir. 1999); <u>Chase</u>, 49 F. Supp.2d at 565. Alternatively, B&H charges that Defendants have unlawfully attempted to monopolize the relevant market, which requires proof (i) that Defendants engaged in anticompetitive conduct with (ii) a specific intent to monopolize and (iii) a dangerous probability of achieving monopoly power. <u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. 447, 456, 113 S. Ct. 884, 890-91 (1993). Under either of these § 2 theories, Plaintiff must show that Defendants engaged in anticompetitive conduct, and it apparently points to the exclusionary nature of the SUPPORT program as satisfying this requirement.

Before turning to the specific arguments advanced in Defendants' motion, the

Court offers some general observations about the nature of the claims and evidence presented by Plaintiff in this case. As is evident from the foregoing discussion of the applicable law, a focal point of all antitrust litigation is a proper determination of the relevant market in which competition is allegedly restrained. Here, Plaintiff alleges in the complaint that the "relevant line of commerce is the sale, lease or rental of medical durable equipment and medical supplies to large insurance provider networks." (First Amended Complaint at ¶ 6.) Leaving aside, for the moment, the somewhat troublesome notion that the buyers in this putative market are "large insurance provider networks" rather than actual consumers of DME/P&O, the parties otherwise are largely in agreement about the remaining aspects of this market definition. Regarding the geographic scope of this market, Plaintiff alleges that it extends throughout the State of Michigan, (id. at ¶ 7), and Defendants accept this premise for present purposes, albeit with the reservation that Plaintiff's business appears to be concentrated primarily in the Detroit metropolitan area.

Beyond these threshold points, however, Plaintiff's various theories of recovery face considerable obstacles. In order to proceed under either § 1 or § 2 of the Sherman Act, Plaintiff must present some plausible measure of the actual or potential harm to competition in the relevant market as a result of Defendants' alleged conduct. It is not enough, standing alone, to show that the SUPPORT program impairs the opportunity of out-of-network vendors such as B&H to make DME/P&O sales to individuals covered by this program. Such an argument, if accepted, would be tantamount to an across-the-board

invalidation of exclusive dealing arrangements in the health care industry, all of which

necessarily entail some restriction upon the ability of out-of-network providers to

compete against their in-network counterparts for the business of consumers within the

closed network. Needless to say, this would fly in the face of the many decisions

upholding such arrangements. See, e.g., Stop & Shop Supermarket, 373 F.3d at 65-69;

Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc., 996 F.2d

537, 545-47 (2d Cir. 1993). Nor is it enough to show that Plaintiff has been injured by its

exclusion from the SUPPORT program, because federal antitrust law protects

competition, not individual competitors. See Brown Shoe Co. v. United States, 370 U.S.

294, 344, 82 S. Ct. 1502, 1534 (1962); Indeck Energy Services, Inc. v. Consumers Energy

Co., 250 F.3d 972, 976 (6th Cir. 2000).[10]

Rather, what is needed are some additional indicia which, when combined with the

undeniably exclusive nature of the SUPPORT program, would support a finding of actual

or potential market harm. As discussed below, Plaintiff's evidence on this point is

woefully inadequate, and its proffered expert analysis of the relevant market is largely

incoherent. Accordingly, while the Court agrees with many of the specific arguments

advanced in Defendants' motion, these challenges merely scratch the surface of what is,

at bottom, an untenable view of antitrust law as a one-size-fits-all means of vindicating

disappointed business expectations.

---

[10]In any event, Plaintiff would have some difficulty in making such a showing, as its
business has experienced strong growth despite its exclusion from the SUPPORT network.

**C.** **Plaintiff Has Failed as a Matter of Law to Demonstrate a Substantial Foreclosure of Competition in the Relevant Market.**

Under <u>Tampa Electric</u> and its progeny, an exclusive dealing arrangement violates §

1 of the Sherman Act only if it forecloses competition in a "substantial share of the

relevant market." <u>Tampa Electric</u>, 365 U.S. at 328, 81 S. Ct. at 628. As the first ground

for seeking summary judgment in their favor, Defendants argue that Plaintiff has failed to

produce evidence of any such "substantial foreclosure" as a result of the challenged

SUPPORT program. The Court agrees.

Before any degree of foreclosure can be measured, of course, it is necessary to

properly define the relevant market. As noted, Plaintiff alleges in its complaint that the

"relevant line of commerce is the sale, lease or rental of medical durable equipment and

medical supplies to large insurance provider networks." (First Amended Complaint at ¶

6.) Yet, these networks themselves do not purchase, lease, or rent such equipment and

supplies, but instead are merely a link in the distribution chain between DME/P&O

vendors (such as B&H and W&F) and the actual end users of these products. Thus,

Plaintiff's economic expert, Dr. John Pisarkiewicz, acknowledges that the market

definition set forth in the complaint should be construed as encompassing the sale, lease

or rental of DME/P&O to the ***individual patients*** covered by large insurance provider

networks. (<u>See</u> Defendants' Motion, Ex. 17, Pisarkiewicz Aff. at ¶ 19.)

Even this revised definition, however, raises various questions that Plaintiff and its

expert fail to satisfactorily address. First, Plaintiff's expert acknowledges that the

reference to "large" networks is ambiguous and "may not have any relevance" to a proper

economic analysis. (Defendants' Motion, Ex. 10, Pisarkiewicz 10/21/2003 Dep. at 261-

62). Next, and more importantly, it is clear that retail vendors of DME/P&O, such as

B&H and W&F, would be pleased to make sales to any individual who arrived at their

doorstep, regardless of whether this individual is covered by an employer-sponsored or

other sort of health insurance plan, and regardless of the exact nature and scope of this

plan's coverage. Furthermore, it seems fair to assume that at least *some* sales, leases, and

rentals of DME/P&O are made to customers who are not covered by any of the "large

insurance provider networks" that comprise Plaintiff's definition of the relevant market.

This being the case, it is difficult to see why the relevant market in this case should

include only those DME/P&O purchases or rentals that involve an "insurance provider

network," as opposed to *all* purchases or rentals regardless of the source of payment. The

relevant product market in an antitrust suit is defined by resort to the "reasonable

interchangeability" standard, which entails "the identification of those products or

services that are either (1) identical to or (2) available substitutes for the defendant's

product or service." White & White, Inc. v. American Hospital Supply Corp., 723 F.2d

495, 500 (6th Cir. 1983). From the vantage point of a DME/P&O vendor, it is not

obvious that there is a significant difference between a customer who pays out of his own

pocket and one whose purchase or rental is covered by an insurance plan. While

uninsured customers might pose a greater risk of non-payment, and while there

undoubtably are advantages to the "captive" customers provided through a closed

insurance network, all of this presumably is offset to some degree by the discounted

reimbursement rate that typically is the *quid pro quo* for admission into a exclusive

provider network.

This usually is where an economic expert enters the picture, in order to justify a

party's proposed limitation on the definition of the relevant market. Unfortunately,

Plaintiff's economic expert has done precisely the opposite, conceding at his deposition

that there is no tenable basis for excluding purchases or rentals by uninsured customers.

Specifically, Dr. Pisarkiewicz opined that such a limitation makes little difference "as a

practical matter," because "as I understand it, most patients out there, looking at the

universe of patients, are backed by some insurance provider." (Defendants' Motion, Ex.

10, Pisarkiewicz 10/21/2003 Dep. at 262.)  Yet, even accepting this proposition — which,

as it happens, has not been established in the evidentiary record — Dr. Pisarkiewicz

agreed that there is no reason to exclude purchases by uninsured customers from the

relevant market, even though these transactions might comprise only a small percentage

of the market. (See id. at 263.)  As he stated, "[c]ertainly Wright & Filippis or B&H or

Binson's would be as happy to serve [uninsured customers] as they are others." (Id.)

Indeed, if such transactions, in fact, make up only a small fraction of the total DME/P&O

sales, leases, and rentals in the pertinent geographic market, then their inclusion

presumably would have little effect upon Plaintiff's economic analysis of the purported

competitive evils of the exclusive SUPPORT program.

The First Circuit addressed a similarly flawed market definition in its recent Stop & Shop Supermarket decision. In that case, involving facts closely analogous to those presented here, the plaintiff vendors, Stop & Shop Supermarket and Walgreen, challenged their exclusion from a prescription drug network established through an agreement between Blue Cross and Blue Shield of Rhode Island and a health benefit administrator, PharmaCare. Like Defendant ABP here, PharmaCare was a subsidiary of a major retail pharmacy chain, CVS. Not surprisingly, CVS's pharmacies were included in the challenged network, and this network subsequently was expanded as a result of a reciprocal agreement between PharmaCare and the administrator of another closed prescription drug network, Provider Health Services, under which the members of each network were permitted to join the other. The plaintiff pharmacy chains charged that this exclusive dealing arrangement violated federal and state antitrust law.

In affirming an award of judgment as a matter of law in favor of defendants Blue Cross, CVS, and PharmaCare, the First Circuit rejected a proposed market definition that is indistinguishable from the one offered by Plaintiff here:

> Plaintiffs sought to offer their market definition evidence primarily, as is typical, through an economist, Dr. Stangle. Dr. Stangle's position in his pretrial report was that the relevant market was "the retail sale of health care financed or insurance reimbursed pharmaceutical products" (the product dimension) in Rhode Island (the geographic dimension). Obviously, excluding retail sales that are not financed or reimbursed increases the percentage size of the foreclosed market.

\* \* \* \*

Plainly, for high-cost prescription drugs, whether insurance will cover purchases at a particular pharmacy tends to be crucial to consumer choice, and Dr. Stangle was correct in [explaining] that a customer who has paid his insurance premium (or had it paid for him) will — at least for high priced drugs — seek out closed network pharmacies if reimbursement is higher and shun those not within the insurer's closed network. At the point of sale, the customer is interested in what he pays and gets reimbursed, not some imputed (and now sunk) insurance premium cost.

Unfortunately for Dr. Stangle's market definition, the concern in an ordinary exclusive dealing claim by a shut-out supplier is with the available market *for the supplier.* Here, for Walgreen and Stop & Shop, their potential customers are presumptively *all* retail customers for prescription drugs — not just that smaller sub-group who are insured or reimbursed. To say that some sub-group of customers is foreclosed proves nothing by itself about the impact on pharmacies.

This is the same defect we recently addressed in [*Eastern Food Services, Inc. v. Pontifical Catholic University Services Association, Inc.,* 357 F.3d 1 (1st Cir. 2004)]. There, as here, a shut-out supplier complained that the foreclosed customers (in *Eastern,* they were students and faculty seeking food services on a university campus) were foreclosed by the university's exclusive dealing contract with another vendor. 357 F.3d at 3-4, 6-7. But the impact of foreclosure on *the supplier* depended not on the impact on the students and faculty but on how many unforeclosed vending machine customers remained elsewhere. *Id.* at 6-7.

Walgreen and Stop & Shop sell prescription drugs to lots of customers including those whose purchases are not reimbursed. Conceivably, the latter could be so small a group that foreclosure of a large percentage of reimbursed customers would still be fatal, or there might be some special circumstance that made separate consideration of the sub-group appropriate. But the former possibility would still have to be proved, normally by a proper market definition; and of the latter, there is no hint in this case.

Conceivably, some adjustment to account for the omission of self-paying customers could be devised from existing evidence:  plaintiffs say

that Blue Cross and [United Healthcare (another health insurer with a closed pharmacy network)] insure 70 percent of Rhode Islanders. But even if a figure representing the entire market could be derived, the number foreclosed by Blue Cross . . . remains unknown because a significant portion of Blue Cross' customers have policies that do not effectively restrict them to the closed network. Nor is it our job to build plaintiffs' case for them.

The plaintiffs refer to other record evidence that they say was available to the jury to establish the same reimbursed-drugs product market *without* testimony from Dr. Stangle. The evidence is described in some detail; for example, the Stop & Shop executive in charge of pharmacy products testified to the same large differential in out of pocket costs to reimbursed and unreimbursed customers. But this simply repeats the same mistake in focus without the Ph.D.

Stop & Shop Supermarket, 373 F.3d at 66-68 (footnote omitted).

Precisely the same can be said here. In order to demonstrate the viability of a product market limited to DME/P&O purchases and rentals by individuals covered by "large insurance provider networks," Plaintiff would have to provide factual support for a number of necessary premises, including: (i) that the percentage of DME/P&O customers who are insured by "large" insurance providers, or at least the percentage who have health insurance coverage, is sufficiently large to warrant the exclusion of purchases by uninsured customers, and (ii) that a significant portion of these insured DME/P&O customers are enrolled in plans that are similar in the relevant respect to the challenged SUPPORT program — that is, plans which effectively prohibit, or at least strongly discourage, purchases from out-of-network DME/P&O providers, through mechanisms such as the "out-of-network sanction" imposed by the SUPPORT program. Plaintiff and

23

its expert fall well short of this evidentiary threshold, offering only the passing and often vague factual assertions (largely unsupported by citation to the record) that, for example, almost half of Michigan residents are covered by BCBSM health insurance policies, that a "large proportion" of these individuals are served by the SUPPORT or NNPN networks, that the "Big Three" automakers and MPSERS are "perhaps the largest employee groups in the state of Michigan," and that the BCBSM traditional and PPO plans offered to these employee groups include "carve-outs" for DME/P&O, with the challenged SUPPORT program being one such carve-out. (See Plaintiff's Suppl. Br., Ex. 2, Pisarkiewicz 4/20/2004 Aff. at ¶¶ 6, 7.)  This simply is not enough of a record to justify a separate "relevant market" consisting solely of DME/P&O purchases, leases or rentals by customers covered by "large insurance provider networks."[11]

Yet, if Plaintiff's proposed market definition is rather suspect, its proposed measure of market foreclosure is utterly indefensible.  In <u>Stop & Shop Supermarket</u>, 373 F.3d at 66, the Court explained that the "first step" in challenging the exclusive dealing

---

[11]Even less tenable is the relevant market definition proposed in Dr. Pisarkiewicz's most recent affidavit — namely, a market consisting solely of "the ABP and Northwood NPN networks." (Plaintiff's Suppl. Br., Ex. 2, Pisarkiewicz 4/20/2004 Aff. at ¶ 31.) As pointed out by Defendants' expert, this tautological approach would invariably lead to the conclusion that *every* exclusive dealing arrangement results in an unlawful monopoly, because the suppliers who are shut out of this arrangement plainly have been excluded from *100 percent* of this "market." (See Defendants' Motion, Ex. 14, Lynk 11/21/2003 Aff. at ¶ 19.) Moreover, this market definition is impossible to square with Plaintiff's own business records, which reflect strong sales performance — and, indeed, impressive growth — despite Plaintiff's exclusion from the SUPPORT and NNPN networks. Plainly, at least *some* DME/P&O customers remain available to Plaintiff despite its exclusion from these networks.

arrangement in that case "would be to show the extent of foreclosure resulting from the Blue Cross contract with CVS and others in the PharmaCare network, taking account of other existing foreclosures." Similarly, Plaintiff here must propose some measure of the extent of foreclosure as a result of the SUPPORT program's exclusive dealing arrangement, taking into account the degree of foreclosure that exists by virtue of other closed DME/P&O networks. Defendants' economic expert, Dr. William J. Lynk, has undertaken such an estimate, opining that the SUPPORT program accounts for 3.1 percent of the Detroit metropolitan area's DME/P&O sales revenues and 1.6 percent of statewide DME/P&O sales. (See Defendants' Motion, Ex. 14, Lynk 11/21/2003 Aff. at ¶ 43.) As discussed below, these percentages, if accurate, plainly would fail as a matter of law to satisfy Tampa Electric's requirement of "substantial foreclosure."

To survive summary judgment, then, Plaintiff and its expert must present a significantly different, yet still plausible, account of market foreclosure in light of the SUPPORT program.[12] In one such effort, to which the Court will return shortly, Plaintiff's expert questions the accuracy of Defendants' estimates of overall DME/P&O

---

[12]As noted, Plaintiff suggests that the market is further foreclosed by virtue of the exclusive NNPN network that (presumably) captures most or all of the DME/P&O sales to the "large" group of General Motors employees and retirees. Plaintiff further suggests that this foreclosure is chargeable to Defendants, as W&F apparently is involved in a joint venture with Binson's Home Health to administer the NNPN network. Leaving aside the lack of allegations or evidence as to the precise nature of this arrangement or its effect on the relevant market, and leaving aside the possible concern that only one of the two joint venturers has been named as a party, the potential significance of the NNPN network is overcome by Plaintiff's larger failure, discussed below, to put forward any tenable theory of substantial market foreclosure.

sales and the SUPPORT network's share of these sales. Next, and more fundamentally, Plaintiff's expert proposes an altogether different measure of market foreclosure, in which the 644 retail DME/P&O outlets in the State of Michigan are classified as either "controlled by" Defendant W&F or not. (See Plaintiff's Suppl. Br., Ex. 2, Pisarkiewicz 4/20/2004 Aff. at ¶¶ 6(l)-(p).) This notion of "control," in turn, depends upon whether a given DME/P&O outlet is operated by a member of the SUPPORT or NNPN networks. (See id.)[13] Upon reviewing this outlet-based data, Plaintiff's expert opines that 296 out of 644 Michigan DME/P&O outlets, or 46 percent, are "controlled" by Defendant W&F. In the Detroit metropolitan area, Plaintiff's expert concludes that 103 out of 310 outlets, or 33 percent, are "controlled" by W&F. These purported "market share foreclosure" rates of 46 and 33 percent suffice, in Plaintiff's view, to raise a "definite question of fact" as to whether the "substantial foreclosure" standard is met here. (Plaintiff's Suppl. Br. at 13.)

As aptly observed by Defendants' expert, this outlet-based measure of market foreclosure "actually manages to be both pointless and perverse at the same time." (Defendants' Suppl. Reply, Ex. 18, Lynk 5/23/2004 Suppl. Aff. at ¶ 30.) As to the former defect, a percentage-of-outlets approach is uninformative in two respects. First, and most obviously, each individual outlet varies in its contribution to the overall market of DME/P&O sales — as an extreme example, one outlet might do a dollar's worth of

---

[13]With regard to the NNPN network, this claim of "control" necessarily rests upon Defendant W&F's purported status as a joint venturer with non-party Binson's Home Health. No evidence has been provided, however, regarding the precise nature of this joint venture or the respective powers possessed by W&F and Binson's over the composition of this network.

annual business while another generates $100 million in annual sales revenue. Next, even

if it were assumed that every outlet makes precisely the same amount of overall sales, this

still would not reveal the percentage of a given outlet's sales that were made to customers

covered by the SUPPORT network or some other exclusive "large insurance provider"

network. If, for example, most of the 296 statewide DME/P&O outlets purportedly

"controlled" by Defendant W&F generated only modest additional sales revenues as a

result of their membership in the SUPPORT or NNPN networks, this would not tend to

suggest a large degree of market foreclosure attributable to these networks. Thus, an

outlet-based approach provides no meaningful insight into the market effects of "large

insurance provider" networks.[14]

---

[14]Giving Plaintiff's expert the benefit of the doubt, perhaps Dr. Pisarkiewicz's discussion of outlets was intended primarily to rebut the references to outlets in the initial affidavit of Defendants' expert, Dr. Lynk. Yet, immediately following his review of Defendant W&F's share of the overall number of retail DME/P&O outlets in Michigan and in the Detroit metropolitan area, Dr. Lynk carefully emphasizes:

> Using a count of retail outlets is a fairly crude way of estimating DME market shares, since different outlets can and do differ substantially in their amount of DME sales. The principal value of these DME [outlet] tabulations is that they are based entirely upon public data. But the best way to estimate shares in this market is by sales revenue.

(Defendants' Motion, Ex. 14, Lynk 11/21/2003 Aff. at ¶ 36.)

Dr. Pisarkiewicz's affidavit notably lacks any such qualifying language. In any event, even if he understands the limited value of an outlet-based analysis, his client evidently does not. In particular, Plaintiff relies broadly and substantially upon this approach in its most recent brief in opposition to Defendants' motion, stating at a number of points that Dr. Pisarkiewicz's analysis demonstrates a market foreclosure rate of 46 percent. (See Plaintiff's Supp. Br. at i, 9-11, 12-13, 19-20.)

27

More fundamentally, this outlet-based methodology runs directly counter to the
core premise underlying Plaintiff's claims in this case. From the complaint, it appears
that the principal evil against which Plaintiff is fighting is the exclusion of B&H and
other DME/P&O vendors from the closed SUPPORT network. As Harold Greenberg,
Plaintiff's owner and operating manager, stated at his deposition, "the reason for the
lawsuit" is "[t]o open [the network] up to everybody." (Defendants' Motion, Ex. 2,
Greenberg 8/27/2003 Dep. at 255.) Yet, under Plaintiff's proposed market foreclosure
analysis, each time another DME/P&O supplier is added to the SUPPORT network, this
supplier's DME/P&O outlets come under the "control" of Defendant W&F, and thus
contribute to the "market foreclosure" brought about by the SUPPORT program.

Defendants' expert, Dr. Lynk, cogently addresses this fundamental inconsistency
in his supplemental affidavit:

> [B]y [Plaintiff's] logic, if the management of the [SUPPORT] network
> decided to invite every DME outlet in the state of Michigan — except B&H
> — to join it, and they all accepted, then [Plaintiff] could, and presumably
> would, argue that "Plaintiff has shown a 99.8 percent market foreclosure."
> In that circumstance, with that expansive degree of network inclusion, the
> same amount of actual business would still be foreclosed to B&H — based
> on the DME spending on behalf of the Support program insured members
> — but in this almost-all-inclusive network setup that same Support program
> business would be shared among virtually all DME providers in the state,
> rather than concentrated on a more compact subset of providers.
>
> So what we are left with here is a plaintiff who wants to argue that
> more network inclusion is competitively better . . . and at the same time
> wants to argue that more network inclusion is competitively worse. B&H
> may want to have it both ways, but the logic that would permit that eludes
> me.

(Defendants' Suppl. Reply, Ex. 18, Lynk 5/23/2004 Aff. at ¶¶ 30-31 (footnotes omitted).)
The Court agrees, and readily concludes that Plaintiff's outlet-based measure of market
foreclosure is invalid.

This leaves only the possibility that Plaintiff and its expert can successfully
challenge Defendants' revenue-based analysis, which indicates that the SUPPORT
program accounts for only 3.1 percent of the Detroit metropolitan area's DME/P&O sales
revenues and only 1.6 percent of statewide DME/P&O sales. Regrettably, Plaintiff's
expert has not undertaken an independent analysis of this sort, but instead merely quarrels
with some of the numbers used in Defendants' calculations.[15]  Generally speaking, Dr.
Pisarkiewicz opines that Dr. Lynk has *overstated* the total amount of spending on
DME/P&O (*i.e.*, the overall market), but has *understated* the amount of DME/P&O
revenues generated by sales within the SUPPORT network (*i.e.*, the SUPPORT network's
share of the overall market). Plainly, both of these challenges, if warranted, would lead to
a higher percentage of market foreclosure attributable to the SUPPORT program.

---

[15]Beyond asserting that some of Defendants' figures are wrong, Dr. Pisarkiewicz
repeatedly complains of his inability to make sense of Dr. Lynk's or Defendants' underlying
financial data. The customary way to resolve such uncertainty, of course, is to depose the
opposing party's expert and its corporate officials with knowledge of the company's finances. It
appears that Plaintiff has taken the depositions of at least some of Defendants' corporate officers.
However, while Plaintiff apparently issued a notice scheduling the deposition of Dr. Lynk for
September 25, 2003, it appears that this deposition did not go forward. No motion has ever been
filed concerning this matter, and Plaintiff did not otherwise seek the Court's assistance in
securing Dr. Lynk's attendance at a deposition. Thus, Plaintiff cannot properly complain about
any inability to explore Dr. Lynk's reasoning, where it failed to properly pursue this matter in
accordance with the usual discovery rules and this Court's orders.

As pointed out by Defendants, it is unnecessary to decide which expert's figures are more accurate. In particular, Dr. Lynk's supplemental affidavit recalculates his initial market foreclosure estimates using the "corrected" figures supplied by Dr. Pisarkiewicz, and arrives at the following revised estimates: (i) the SUPPORT network's share of DME/P&O sales revenues in the metropolitan Detroit area is 12.5 percent (versus 3.1 percent under Dr. Lynk's initial calculations), and (ii) the SUPPORT network's share of DME/P&O sales revenues for the State of Michigan is 6.5 percent (versus 1.6 percent under Dr. Lynk's initial calculations). (See Defendants' Suppl. Reply, Ex. 18, Lynk 5/23/2004 Aff. at ¶ 13.) As noted by Dr. Lynk, this results in roughly a four-fold increase from his initial estimates of market foreclosure.[16]

Even under these increased estimates, both sides agree that an exclusive dealing arrangement that forecloses 12.5 percent of the relevant market (the highest rate derived from Dr. Lynk's use of Dr. Pisarkiewicz's preferred figures) does not run afoul of the "substantial foreclosure" standard of Tampa Electric. As observed in Stop & Shop Supermarket, 373 F.3d at 68, "foreclosure levels are unlikely to be of concern where they

---

[16]Dr. Lynk also derives a comparable, 15.43 percent market foreclosure rate using figures obtained solely from Plaintiff and its expert. Specifically, Dr. Lynk notes that B&H reported revenues of $3,589,213 for 2003, and that, according to Dr. Pisarkiewicz's calculations, B&H would have attained additional revenues of $654,893 if it had been admitted into the SUPPORT network. Adding these two figures results in a hypothetical total of $4,244,106, of which the "denied" revenues of $654,893 comprises 15.43 percent. This calculation, while inferior to a direct determination of the SUPPORT network's share of the overall DME/P&O market, at least tends to confirm that Plaintiff's exclusion from the SUPPORT network has not thwarted an abundance of sales opportunities that Plaintiff otherwise would have enjoyed.

are less than 30 or 40 percent." See also Reddy v. Good Samaritan Hospital & Health

Center, 137 F. Supp.2d 948, 969 (S.D. Ohio 2000) (finding that an exclusive contract

resulting in a market foreclosure rate between 14.7 and 18 percent did not unreasonably

restrain competition); Minnesota Mining & Mfg. Co. v. Appleton Papers Inc., 35 F.

Supp.2d 1138, 1143 (D. Minn. 1999) ("Generally speaking, a foreclosure rate of at least

30 percent to 40 percent must be found to support a violation of the antitrust laws.").

Similarly, Plaintiff's expert has testified that market foreclosure typically becomes a

concern only at the 30 to 35 percent level. (See Plaintiff's Response Br., Ex. 7,

Pisarkiewicz 10/21/2003 Dep. at 330-32.)  Finally, Plaintiff recently quoted with approval

(and with emphasis) Defendants' "most important admission" that "*a foreclosure rate in*

*excess of 30% generally is necessary in order to establish violation of the Sherman Act*

*through an exclusive dealing arrangement.*" (Plaintiff's Suppl. Br. at 11 (quoting

Defendants' Motion, Br. in Support at 16).)  The Court concurs with the parties on this

point, and holds that Plaintiff has failed as a matter of law to establish that the SUPPORT

program has foreclosed competition in a substantial share of the relevant market.

A more general and qualitatively-oriented "rule of reason" inquiry leads to the

same conclusion.  As noted earlier, exclusive dealing arrangements such as the

SUPPORT program are not *per se* unlawful, but instead must be assessed under familiar

"rule of reason" principles.  See, e.g., Stop & Shop Supermarket, 373 F.3d at 62; Capital

Imaging, 996 F.2d at 543, 545-47; U.S. Healthcare, 986 F.2d at 593-97; Collins, 844 F.2d

at 479-80. Under this analytical framework, the Court must consider the history and

nature of the challenged restraint and its effect on competition. See State Oil Co. v.

Khan, 522 U.S. 3, 10, 118 S. Ct. 275, 279 (1997); National Hockey League Players'

Ass'n v. Plymouth Whalers Hockey Club, 325 F.3d 712, 718 (6th Cir. 2003). The

plaintiff bears the initial burden of establishing "that the restraint produces significant

anticompetitive effects within the relevant product and geographic markets," and the

defendant then "must come forward with evidence of the restraint's procompetitive

effects to establish that the alleged conduct justifies the otherwise anticompetitive

injuries." Plymouth Whalers, 325 F.3d at 718 (internal quotations and citations omitted).

"If the defendant is able to demonstrate procompetitive effects, the plaintiff then must

show that any legitimate objectives can be achieved in a substantially less restrictive

manner." 325 F.3d at 718.

A detailed "rule of reason" analysis is unnecessary here. First, Plaintiff and its

expert have not propounded one, but instead devote the bulk of their efforts to critiquing

Defendants' analysis and extolling the virtues of open provider networks and the "any

willing provider" legislation enacted by some states. None of this denies that exclusive

arrangements have their benefits as well, and these have been repeatedly recognized by

the courts. See, e.g., Stop & Shop Supermarket, 373 F.3d at 65 (citing "reduced cost,

stable long-term supply, [and] predictable prices" as possible benefits); U.S. Healthcare,

986 F.2d at 595 (noting that exclusive dealing arrangements may serve such "benign"

objectives as "assurance of supply or outlets, enhanced ability to plan, reduced

transactions costs, [and] creation of dealer loyalty"). Plaintiff has not cited any authority

for the proposition that federal antitrust law weighs in on one side or the other of this

policy debate — to the contrary, as noted earlier, the courts have recognized that

exclusive dealing arrangements are not *per se* unlawful, but must be evaluated on a case-

by-case basis. In any event, even accepting Plaintiff's challenges to the validity of

Defendants' pro-competitive justifications for the SUPPORT program, this does nothing

to aid Plaintiff in meeting its threshold burden of demonstrating that this program has had

significant anticompetitive effects in the relevant market. See Capital Imaging, 996 F.2d

at 547 (observing that the defendants' purported failure in that case to advance any

procompetitive justifications for their conduct was immaterial, where the plaintiff had not

"carried its own initial burden of showing a restraint upon competition").

    More fundamentally, even cursory consideration fails to disclose any "rule of

reason" factors that would favor Plaintiff's position here. Initially, there is nothing in the

history or underlying structure of the SUPPORT program that would generate any

heightened risk of injury to competition, beyond that which flows inevitably from any

exclusive dealing arrangement. While Defendants might not be adverse to declining

competition among DME/P&O providers, their alleged co-conspirator, BCBSM, would

have nothing to gain, and seemingly much to lose, by suppressing competition in this

market. Stop & Shop Supermarket makes precisely this point in language that is directly

applicable here, observing that "Blue Cross would be disserved by making CVS [or, here, W&F] a monopolist, which could then exploit Blue Cross by demanding higher reimbursement." 373 F.3d at 66.

This is all the more true where, as here, an exclusive dealing arrangement is subject to periodic renewal, so that it would be in BCBSM's best interest if more DME/P&O providers were available to competitively bid upon each renewal of the SUPPORT contract or otherwise challenge Defendants' current hold upon this business. See Indeck Energy Services, 250 F.3d at 978 (noting that the limited duration of an exclusive agreement mitigates the risk of injury to competition); Balaklaw v. Lovell, 14 F.3d 793, 799 (2d Cir. 1994); U.S. Healthcare, 986 F.2d at 596. In addition, it bears mention that BCBSM developed the SUPPORT program in response to the expressed desire of its customer, Chrysler, to explore the use of "carve-out" arrangements in order to control health care costs. BCBSM presumably could ill-afford to cater to the allegedly anticompetitive impulses of Defendants at the expense of its own customers' concerns about the rising cost of health care services.

Moreover, beyond this absence of any indication that the SUPPORT program, by its very nature and history, poses any special threat to competition, Plaintiff and its expert have failed to produce any evidence that competition actually has been impaired. As noted, B&H itself has fared quite well despite its exclusion from the SUPPORT network — using data supplied by Plaintiff and its expert, Defendants' expert has calculated a

34

137.7 percent growth in Plaintiff's revenues between 2001 and 2003, the two-year period immediately following the revocation of B&H's brief admission into the network. Even assuming that this revenue increase would have been even greater if B&H were part of the SUPPORT network, Plaintiff has not cited any authority for the proposition that such a disappointed expectancy of greater revenue would be a cognizable harm to competition under antitrust law. Yet, apart from this data regarding its own increasing revenues, Plaintiff has produced no evidence whatsoever reflecting any purportedly anticompetitive consequences of the SUPPORT program to DME/P&O suppliers generally. There is no indication in the record, for example, that any such provider has suffered business losses or ceased its operations as a result of its exclusion from the SUPPORT network.

Nor, more importantly, is there any evidence that DME/P&O consumers have been injured, whether in the form of anticompetitive prices or decreased quality or quantity of services. Regarding the latter, Plaintiff offers only the inchoate fear that other competitors might not remain to fill the gap if Defendants should "falter or fail to provide adequate services to the enrollees of the SUPPORT Program." (Plaintiff's Suppl. Br. at 17.) This tacitly acknowledges, or at least suggests, that Defendants *are* presently providing adequate services, and the record in no way refutes this proposition.[17] More generally, Plaintiff opines that a more inclusive network would enhance consumer choice,

---

[17]Indeed, Plaintiff elsewhere concedes that "there is no easy method to measure quality of DME." (Plaintiff's Suppl. Br. at 13.) Regardless of the difficulty of proof on this issue, the brute fact remains that the record is devoid of any evidence that plan participants or DME/P&O consumers generally have suffered a reduction in quality as a result of the SUPPORT program.

and thereby lead to increased competition and corresponding improvements in the quantity and quality of services. This, of course, is nothing more than a challenge to exclusive dealing arrangements generally, and the Court already has noted that this policy judgment has not been incorporated into antitrust law.

Finally, regarding the costs of DME/P&O, Plaintiff and its expert apparently argue that the anticompetitive impact of the SUPPORT program is reflected in the increased "per member per month" ("PMPM") capitation rate paid by Chrysler over the 10-year term of its participation in the SUPPORT program. Specifically, Plaintiff's expert has prepared a table of data that seemingly reflects a doubling of this PMPM rate between 1992 and 2003, at least for Michigan plan participants who are not eligible for Medicare. Yet, no effort has been made to show that these increases have outpaced the rising cost of health care generally, or even DME/P&O in particular. Nor has Plaintiff's expert opined whether, despite this increase over a decade or more, Chrysler and its employees still have enjoyed a net benefit from the institution of a carve-out program for DME/P&O, where the SUPPORT program in its initial years, at least, provided substantial savings over what the company had been paying for DME/P&O coverage under its previous BCBSM plans. A mere showing of increased capitation rates in isolation, without any attempt to place this data into the larger context of the market as a whole, does not suffice to raise an issue of fact as to the purportedly anticompetitive effects of the SUPPORT program. Accordingly, Defendants are entitled to summary judgment in their favor on Plaintiff's §

1 challenge to the exclusionary SUPPORT network.

**D.      Plaintiff's § 2 Claim Fails for Lack of Evidence of Defendants' Monopoly Power.**

The foregoing analysis largely defeats Plaintiff's § 1 and § 2 claims alike because, in either case, Plaintiff must demonstrate harm to competition in the relevant market. As already explained, Plaintiff has not produced evidence of any such harm to competition in the DME/P&O market, but (at best) has offered evidence of injury to a single competitor, itself. Beyond this, however, Defendants contend that Plaintiff's § 2 claim of monopolization also fails for lack of evidence that W&F possesses the requisite degree of monopoly power in the relevant DME/P&O market. The Court again agrees.

At the outset, the Court again is compelled to observe that Plaintiff and its expert have utterly failed to present any sort of cogent analysis of the market power possessed by W&F in any plausible DME/P&O market. As discussed earlier, Plaintiff and its expert have not made a case for the recognition of a separate "market" consisting of either patients covered by "large" insurance provider networks or, as Plaintiff's expert has more recently (and even less plausibly) advocated, patients covered by the SUPPORT and NNPN networks. Likewise, the Court already has rejected Plaintiff's proposed analysis of the "market" of retail DME/P&O outlets purportedly "controlled" by Defendants. Yet, beyond their discussion of these untenable "markets," Plaintiff and its expert offer absolutely no analysis or data that might permit the Court — albeit without assistance from the party bearing the burden of proof on this point — to estimate Defendants' share

37

of the DME/P&O market in Michigan. This poses a considerable obstacle to Plaintiff's

satisfaction of the "monopoly power" element of its § 2 claim.

Nonetheless, Plaintiff suggests that it has produced "direct evidence" of

Defendants' monopoly power, and thus need not establish this element indirectly through

analysis of market share. As Plaintiff correctly points out, a market share analysis is not

necessary where the defendant's monopoly power can be established directly through

"evidence showing the exercise of actual control over prices or the actual exclusion of

competitors." Re/Max International, Inc. v. Realty One, Inc., 173 F.3d 995, 1016 (6th

Cir. 1999) (internal quotations and citation omitted). Here, Plaintiff claims to have

produced both such forms of direct evidence of monopoly power, pointing to (i) the

doubling of non-Medicare PMPM rates paid by Chrysler under the SUPPORT program

between 1992 and 2003, and (ii) Defendants' authority over the admission of DME/P&O

vendors into the SUPPORT network.

Once again, however, these examples of purported control over prices or exclusion

of competitors rest upon the untenable premise that the relevant "market" in this case

consists solely of the SUPPORT network itself. As noted earlier, Plaintiff has made

absolutely no effort to link the capitation rates charged under the SUPPORT program to

the cost of DME/P&O in the overall market, or to compare the SUPPORT rates to

DME/P&O costs in markets outside the Michigan geographic market at issue here.

Indeed, the record does not even indicate the extent to which the prices charged by

***Plaintiff itself*** have changed over time. Absent such contextual data, the increased rates

charged under the SUPPORT program cannot serve as "direct evidence" of Defendants'

purported control over prices in a properly defined DME/P&O market — for all that one

can tell from the record, the SUPPORT rates might precisely track increased DME/P&O

costs throughout the country, thereby indicating that W&F is subject to the very same

market forces that influence the rates charged by B&H and other vendors. Plaintiff's own

expert acknowledged this point at his deposition, testifying that the SUPPORT contract

rates, by themselves, "do[] not indicate anything," and that "you'd have to put it in

context and look at what the alternatives are and make a decision ba[s]ed on that."

(Defendant's Suppl. Reply, Ex. 26, Pisarkiewicz 5/4/2004 Dep. at 678.)

Similarly, the only "exclusionary" power disclosed in the record is Defendants'

undisputed authority to exclude particular DME/P&O vendors from the SUPPORT

network. There is absolutely no evidence that competitors have been excluded from the

larger DME/P&O market — to the contrary, the record shows that B&H, at least, has

enjoyed continued growth and strong performance in this market, despite its exclusion

from the SUPPORT network. In addition, Defendants have produced evidence, which

Plaintiff and its expert apparently do not dispute, that there are no barriers to the entry of

new competitors into the DME/P&O market — and, again, Plaintiff's own success

illustrates this point.[18] Consequently, the Court finds no evidence, whether direct or

---

[18]Notably, in light of this apparent absence of barriers to entry, Plaintiff's "price control"
evidence is even less probative on the issue of Defendants' monopoly power over the DME/P&O

circumstantial, that could sustain the "monopoly power" element of Plaintiff's § 2 claim of monopolization.

**E.     Plaintiff Has Failed to Identify an Injury to Competition, as Opposed to an Injury to Itself as an Individual Competitor.**

Beyond these fatal flaws in Plaintiff's § 1 and § 2 claims, Defendants suggest a number of additional grounds for granting summary judgment in their favor. The Court elects to address only one of these contentions — namely, the claimed absence of antitrust injury — as the outcome of this inquiry flows readily from the Court's analysis to this point.

The Sixth Circuit recently addressed the requirement that a plaintiff must identify an "antitrust injury" in order to have standing to bring an antitrust suit:

> Under Sixth Circuit case law, it is not enough for the plaintiff to claim economic injury: Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. Such a heightened standard is required because the relevant antitrust laws were enacted for the protection of *competition* and not *competitors*.

> By emphasizing the importance of establishing "antitrust injury," courts ensure that antitrust litigants use the laws to prevent anti-competitive action and make[] certain that they will not be able to recover under the

---

market. As Defendants' expert correctly points out, "[i]f a would-be local 'monopolist' finds that an attempt to profit by raising price significantly above the competitive level is defeated by the entry of new competitors who are attracted by the high prevailing prices, then the 'monopolist' lacks monopoly power." (Defendants' Motion, Ex. 14, Lynk 11/21/2003 Aff. at ¶ 45.) As applied here, if Defendants' capitation rates are artificially high, this presumably would attract competitors who would seek to challenge their hold on the DME/P&O business generated through the SUPPORT program — and BCBSM would be free, of course, to turn to these competitors when the SUPPORT contract came up for renewal.

> antitrust laws when the action challenged would tend to promote
> competition in the economic sense. Otherwise, routine disputes between
> business competitors would be elevated to the status of an antitrust action,
> thereby trivializing the Act because of its too ready availability.

Indeck Energy Services, 250 F.3d at 976 (internal quotations and citations omitted).

In arguing that it has produced evidence of "antitrust injury" in this case, Plaintiff cites its expert's computation of the damages allegedly suffered by B&H as a result of its exclusion from the SUPPORT network. Specifically, Plaintiff's expert opines that B&H would have realized additional income of $897,862 if it had been allowed to participate in the SUPPORT program. Plaintiff contends that this lost income qualifies as an "antitrust injury," where it is the direct result of W&F's exclusion of a competitor, B&H, from the market for DME/P&O, and therefore reflects harm to competition as a whole.

Once again, however, Plaintiff has advanced an argument under the *premise* that an exclusive DME/P&O network represents a violation of antitrust law. In particular, an "antitrust injury" generally arises only where there is a "causal connection between the antitrust violation and harm to the plaintiff," Indeck Energy Services, 250 F.3d at 976, and Plaintiff here merely asserts, without analysis, that the SUPPORT program provides the requisite violation. To accept this point uncritically, however, would render the requirement of "antitrust injury" a nullity in cases involving exclusive dealing arrangements. In any such case, an excluded competitor would be able to identify some amount of business that it was prevented from obtaining as a result of its exclusion. Under Plaintiff's view of the law, this alone is enough to establish standing to bring an

41

antitrust action.

Needless to say, the courts have required something more, even in cases involving exclusive dealing arrangements. Indeck Energy Services is one such case, where the plaintiff energy supplier, Indeck, challenged the defendant's exclusive 5-to-10-year agreement to provide power for several General Motors facilities. The defendant utility, Consumers Energy, offered a sizable discount to induce General Motors to agree to this exclusive arrangement. In addition, when Consumers Energy found it necessary to obtain additional power in order to meet the needs of General Motors and its other customers, it purchased this power from an affiliated supplier, rather than allowing Indeck or other independent suppliers to participate in this arrangement. As a result of these actions by Consumers Energy, Indeck alleged that it had been excluded from over 80 percent of the power supply market.

The Sixth Circuit held that Indeck had failed to establish its standing to bring a claim under antitrust law:

> In this case, an examination of the antitrust standing factors leads to the inescapable conclusion that the district court appropriately dismissed Indeck's cause of action against the defendants. Significantly, the only harm allegedly suffered by Indeck was in the company's capacity as a competitor in the marketplace, not as a defender of marketplace competition. Although antitrust actions may, of course, be initiated by marketplace competitors, those actors in the economic forum must at least allege that exclusion of the competitor from the marketplace results in the elimination of a superior product or a lower-cost alternative. The record in this appeal presents no indication that *competition* itself was harmed by any act of the defendants. Consequently, the antitrust damages alleged by Indeck are too indirect and speculative to justify assertion of federal

42

antitrust jurisdiction over this matter.

Indeck Energy Services, 250 F.3d at 977 (footnote omitted); see also Balaklaw, 14 F.3d at

799-800 (finding no antitrust injury where "opportunities for competition remain[ed]" in

light of the limited 3-year term of the challenged exclusive agreement, and where the

plaintiff "has alleged no threat of 'adverse economic consequences' to anyone but

himself"); Capital Imaging, 996 F.2d at 547 (rejecting an antitrust claim where the

plaintiff's "position is simply that it has been harmed as an individual competitor," but the

plaintiff had not "shown that defendants' activities have had any adverse impact on price,

quality, or output of medical services offered to consumers in the relevant market").

Precisely the same flaw defeats Plaintiff's antitrust claims in this case.  While

Plaintiff has produced an expert opinion as to *B&H's* loss of anticipated income, the

record is devoid of evidence that *competition as a whole* has suffered as a result of the

exclusive SUPPORT program.[19]  There is no evidence, for example, that DME/P&O

providers have been driven out of business or that consumers have been saddled with

---

[19]Indeed, Defendants correctly observe that Plaintiff's theory of damages is apparently at
odds with any claim of injury to competition as a whole.  If the violation here stems from the
exclusive nature of the SUPPORT program, the obvious cure would be to open the SUPPORT
network to *all* DME/P&O providers.  In this event, of course, B&H would not be the only
beneficiary of an open market, but would have to compete in this marketplace against all other
DME/P&O vendors that previously were excluded from the SUPPORT network.  Yet, Plaintiff's
computation of its damages seemingly fails to account for, or even address, the significantly
increased field of DME/P&O competitors if the SUPPORT network were no longer exclusive.  In
Defendants' view, Plaintiff's theoretical increased revenues would be quite modest, amounting to
perhaps only 1.5 percent of its overall revenues, if the SUPPORT network were open to all
DME/P&O providers.

poor quality goods or services. Nor, as observed earlier, does Plaintiff's limited and somewhat mixed data regarding increased PMPM rates over a 10-year period indicate that the SUPPORT program has led to higher DME/P&O prices than otherwise would have resulted in the absence of an exclusive arrangement. Finally, just as in <u>Indeck Energy</u> <u>Services</u> and the other above-cited cases, the limited duration of the SUPPORT contract affords BCBSM and its customers, including DaimlerChrysler and Ford, the periodic opportunity to make different arrangements if the SUPPORT program or Defendants' performance is not achieving the desired objectives.

In the end, the Court returns to the point made at the outset of its analysis. If exclusive dealing arrangements could be challenged solely on the basis that they threaten harm to an excluded competitor, then antitrust law would quickly sound the death knell for such arrangements. As observed, however, these arrangements are ***not*** deemed unlawful *per se,* but instead must be shown in a particular case to harm competition in the relevant market. Here, Plaintiff has failed to present a satisfactory definition of the relevant product market, and has further failed to produce evidence of harm to competition in this market. Rather, the record shows, at most, that Plaintiff itself has been deprived of additional revenues as a result of its exclusion from the SUPPORT network — but that B&H, nonetheless, has continued to enjoy significant success in the DME/P&O marketplace. Such a record manifestly fails as a matter of law to sustain a claim under federal antitrust law.

## IV. **CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' December 4,

2003 Motion for Summary Judgment is GRANTED.

Gerald E. Rosen
United States District Judge

PURSUANT TO RULE 77 (d), FED. R. CIV. P.
COPIES MAILED TO ATTORNEYS FOR ALL
PARTIES ON _____10-29_____, 20 04

_____
DEPUTY COURT CLERK

45