**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

LITTLE ROCK CARDIOLOGY CLINIC, P.A., *et al*.                    PLAINTIFFS

v.                                        NO. 4:06CV01594 JLH

BAPTIST HEALTH; ARKANSAS BLUE
CROSS AND BLUE SHIELD; USABLE
CORPORATION; BAPTIST MEDICAL
SYSTEM HMO, INC.; and HMO PARTNERS, INC.                    DEFENDANTS

## OPINION AND ORDER

This is an antitrust case alleging violations of sections 1 and 2 of the Sherman Act, 15 U.S.C.

§§ 1 and 2.  The plaintiffs seek treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15,

and injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26.  The complaint was

initially filed by Little Rock Cardiology Clinic, P.A., against Baptist Health on November 2, 2006.

Little Rock Cardiology Clinic, as the name indicates, is a professional association of cardiologists

practicing medicine in Little Rock.  Baptist Health is a nonprofit corporation that operates five

hospitals in Arkansas, including one in Little Rock and one in North Little Rock.

Although the initial complaint named only Baptist Health as a defendant, it alleged that

Arkansas Blue Cross and Blue Shield, a nonprofit mutual insurance company, and Baptist Health

conspired to restrain trade in, and to monopolize the market for, cardiology services for privately

insured patients in a sixteen county area of central Arkansas in violation of sections 1 and 2 of the

Sherman Act.  The complaint also alleged that Baptist Health attempted to monopolize and has

monopolized the same market.  Before Baptist Health responded to the complaint, an amended

complaint was filed, making substantially the same allegations as the initial complaint except that

seven of the physicians who practice with Little Rock Cardiology Clinic, and their individual

professional associations, were added as plaintiffs.  A little more than a year after the initial

complaint was filed, the plaintiffs moved for leave to file a second amended complaint, and that motion was granted.  The second amended complaint added as defendants Arkansas Blue Cross and Blue Shield, USAble Corporation, Baptist Medical System HMO, Inc., and HMO Partners, Inc. USAble Corporation is a wholly-owned subsidiary of Arkansas Blue Cross and Blue Shield.  HMO Partners, Inc., which is owned by Baptist Medical System HMO, Inc., and USAble Corporation, operates an HMO named Health Advantage.[1]  The defendants then moved to dismiss the second amended complaint for failure to state a claim upon which relief can be granted.  The Court concluded that the second amended complaint failed to state a claim upon which relief could be granted but, over the defendants' objections, gave the plaintiffs leave to file a third amended complaint.  The plaintiffs filed their third amended complaint on March 27, 2008.

The alleged wrongdoing for which the plaintiffs seek relief in this case began as a response to the opening of the Arkansas Heart Hospital in Little Rock in 1997.  The owners of that hospital included cardiologists who practiced at Little Rock Cardiology Clinic, who were on staff at the Baptist Hospital in Little Rock, and who participated in the Arkansas FirstSource network. FirstSource was a network of providers used by all of the health plans offered by Blue Cross and its affiliates.  Shortly after Arkansas Heart Hospital opened, the Little Rock Cardiology Clinic and the doctors who practiced there were excluded from the FirstSource network.  According to the third amended complaint, the cardiologists at the Little Rock Cardiology Clinic are the only specialists in the state of Arkansas excluded from that network.  The motive for excluding them from the network, according to the third amended complaint, was to protect Baptist Health from competition

---

[1] This opinion will refer to Arkansas Blue Cross and Blue Shield, USAble Corporation, and HMO Partners, Inc., collectively as "Blue Cross," unless expressly stated or the context indicates otherwise.

by Arkansas Heart Hospital. Further, in May 2003, Baptist Health adopted an "economic credentialing policy" to prohibit any doctor from having or maintaining staff privileges at any Baptist Health facility if that doctor directly or indirectly holds an interest in a competing hospital, which is defined as any hospital in the state of Arkansas. The enforcement of that policy was preliminarily enjoined in February 2004 and has not been enforced since then. *See Baptist Health v. Murphy*, 365 Ark. 115, 226 S.W.3d 800 (2006).[2]

The third amended complaint alleges seven claims for relief under the Sherman Act. Count I alleges that the defendants have engaged in an unlawful contract combination, concerted action, or conspiracy to exclude competition and unreasonably restrain interstate commerce in a market for services to cardiology patients in violation of section 1 of the Sherman Act. Counts II, III, and IV allege a conspiracy to monopolize, attempt to monopolize, and monopolization of a market for services to cardiology patients in violation of section 2 of the Sherman Act. The claims for relief alleged in Counts I-IV are the same claims for relief that were alleged in the first three versions of plaintiffs' complaint. The new claims for relief alleged for the first time in the third amended complaint are Counts V, VI, and VII, which allege a conspiracy to monopolize, attempt to monopolize, and monopolization of a market for private health insurance in violation of section 2 of the Sherman Act. The third amended complaint also added Count VIII, which seeks injunctive relief.

---

[2] For opinions in previous actions filed in federal court, *see Ark. Blue Cross & Blue Shield v. St. Vincent Infirmary Med. Ctr.*, No. 4:07CV00813, 2007 WL 4287842 (E.D. Ark. Dec. 5, 2007); *Ark. Blue Cross & Blue Shield v. St. Vincent Infirmary Med. Ctr.*, No. 4:03CV00662, 2006 WL 796949 (E.D. Ark. Mar. 27, 2006); *Murphy v. Baptist Health*, No. 4:04CV0112, 2004 WL 1474655 (E.D. Ark. Feb. 24, 2004).

The defendants have moved to dismiss the third amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Baptist Health[3] argues, in part, that the case cannot be allowed to go forward based on the third amended complaint because the relevant market alleged is incoherent and therefore incapable of forming the basis on which adjudication of these antitrust claims can proceed.  Blue Cross joins to a large extent in the arguments of Baptist Health but also contends that the claims against it are barred by the statute of limitations.  Baptist Health, in turn, has adopted by reference Blue Cross's arguments as to the statute of limitations.  All defendants argue that these plaintiffs have no standing to assert the section 2 claims pertaining to insurance services.[4]

The Court has concluded that all of the plaintiffs' damages claims are barred by the statute of limitations except the claims against Baptist Health asserted in Counts I-IV; and that plaintiffs' claims for injunctive relief are barred by laches.  The Court has also concluded that the relevant market alleged for Counts I-IV in the third amended complaint is, indeed, incoherent, and that this incoherence results not from inadequate draftsmanship or the absence of discovery but from an incurable defect in the legal theory; which is to say that the Court does not believe that the deficiencies can be cured by further amendment.  Therefore, the third amended complaint in its entirety will be dismissed with prejudice.

---

[3] "Baptist Health" in this opinion will include the wholly-owned subsidiary, Baptist Medical System HMO, Inc., unless expressly stated or the context indicates otherwise.

[4] Because Counts V-VII are dismissed on other grounds, the Court will not address the issue of whether the plaintiffs have standing to assert the section 2 claims pertaining to insurance services.

## I.  THE STANDARD FOR RULING ON A 12(b)(6) MOTION

Rule 8(a) of the Federal Rules of Civil Procedure provides that a pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief.  Rule 12(b)(6) authorizes a party to move to dismiss an action based upon the failure to state a claim upon which relief can be granted.  The pleading must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).  Although Rule 8(a)(2) does not require detailed factual allegations, that rule does require "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 1965.  "While the court must accept allegations of fact as true when considering a motion to dismiss, the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations."  *Wiles v. Capital Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002); *see also Taxi Connection v. Dakota, Minn. & Eastern R.R. Corp.*, 513 F.3d 823, 826 (8th Cir. 2008) (stating that the court is not required to accept "mere conclusions" alleged in the complaint).  "The plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims . . . rather than facts that are merely consistent with such a right."  *Stalley ex rel. U.S. v. Catholic Health Initiative*, 509 F.3d 517, 521 (8th Cir. 2007) (citing *Twombly*, 127 S. Ct. at 1964-66).

## II.  THE STATUTE OF LIMITATIONS

Actions seeking damages pursuant to section 4 of the Clayton Act are subject to the four-year statute of limitations provided in section 4B of the Clayton Act, 15 U.S.C. § 15b.  Here, the initial complaint, which was filed on November 2, 2006, named Baptist Health as the only defendant and asserted only the claims relating to the market for "cardiology services for privately insured

individuals." Compl. ¶¶ 32, 37, 47, 54.  On December 17, 2007, the plaintiffs filed their second amended complaint adding Arkansas Blue Cross and Blue Shield, USAble Corporation, Baptist Medical System HMO, Inc., and HMO Partners, Inc., as defendants.  The claims relating to the market for health insurance were added in the third amended complaint, which was filed on March 27, 2008.  The third amended complaint alleges that an illegal combination began no later than early 1997 (paragraph 131), that USAble Corporation terminated its contract with the plaintiffs in June of 1997 (paragraph 132), that HMO Partners terminated its contract with the plaintiffs in September of 1997 (paragraph 137), and that the defendants had acquired monopoly power in the hospital services and private insurance markets by 2001 (paragraph 82).  All of these events occurred more than four years before the plaintiffs filed the original complaint on November 2, 2006, or the second amended complaint on December 17, 2007.[5]

The plaintiffs argue that they have alleged facts to show a continuing conspiracy or continuing violation within four years of the filing of the complaint and the second amended complaint and, therefore, their claims are not barred by the statute of limitations.

The classic statement of the continuing violation doctrine is found in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968).  United monopolized the shoe machinery industry.  Hanover was a shoe manufacturer and one of United's customers.  Starting in 1912, United would not sell machinery to shoe manufacturers but, instead, used its monopoly power to require shoe manufacturers to lease its machinery.  Hanover filed suit

---

[5] For purposes of ruling on the motions to dismiss, the Court will assume, without deciding, that all claims relate back to the second amended complaint as to the defendants first named in that complaint and back to the original complaint as to Baptist Health.  No argument is made that the claims against defendants other than Baptist Health relate back to the original complaint under Fed. R. Civ. P. 15(c)(1)(C).

in 1955.   In rejecting United's argument that Hanover's claim was barred by the statute of

limitations, the Supreme Court said:

> United has also advanced the argument that because the earliest impact on Hanover
> of United's lease only policy occurred in 1912, Hanover's cause of action arose
> during that year and is now barred by the applicable Pennsylvania statute of
> limitations.   The Court of Appeals correctly rejected United's argument in its
> supplemental opinion.  We are not dealing with a violation which, if it occurs at all,
> must occur within some specific and limited time span.  *Cf. Emich Motors Corp. v.*
> *General Motors Corp.*, 229 F.2d 714 (C.A.7th Cir. 1956), upon which United relies.
> Rather, we are dealing with conduct which constituted a continuing violation of the
> Sherman Act and which inflicted continuing and accumulating harm on Hanover.
> Although Hanover could have sued in 1912 for the injury then being inflicted, it was
> equally entitled to sue in 1955.

*Id*. at 502 n.15, 88 S. Ct. at 2236 n.15.  The critical distinction made by the court in *Hanover Shoe*

is the distinction between "a violation which, if it occurs at all, must occur within some specific and

limited time span" and "conduct which constituted a continuing violation of the Sherman Act and

which inflicted continuing and accumulating harm" on the plaintiff.  The *Emich Motors* case – which

the court cited as an example of "a violation which, if it occurs at all, must occur within some

specific and limited time span" – was a case in which a dealer was terminated as part of a conspiracy

between GM, GMAC, and others to control the financing of automobile purchases by compelling

dealers to use the financing offered by GMAC.  *Emich Motors*, 229 F.2d at 715.  The terse

discussion in *Hanover Shoe* does not explain why a dealer termination, which results in an ongoing

exclusion from a business relationship with the manufacturer, is an example of a violation "which

. . . must occur within some specific and limited time."  *Hanover Shoe*, 392 U.S. at 502 n.15, 88 S.

Ct. at 2236 n.15.

The Eighth Circuit discussed the continuing violation theory in *Midwestern Machinery v.*

*Northwest Airlines*, 392 F.3d 265 (8th Cir. 2004).  Although the purpose of the discussion there was

to explain why the continuing violation theory does not apply to a case alleging that a merger

7

violated section 7 of the Clayton Act, all parties have urged the Court to accept that case as controlling authority. The discussion in *Midwestern Machinery* begins with the observation that the typical antitrust continuing violation occurs in a price-fixing conspiracy actionable under section 1 of the Sherman Act "when conspirators continue to meet to fine-tune their cartel agreement." *Id.* at 269. "These meetings are overt acts that begin a new statute of limitations because they serve to further the objections of the conspiracy." *Id.* Outside the context of a RICO or Sherman Act conspiracy, "new overt acts must be more than the unabated inertial consequences of the initial violation." *Id.* at 270. In explaining the distinction in footnote 15 of *Hanover Shoe*, *Midwestern Machinery* says that the Supreme Court "endorsed the Third Circuit's reasoning that United's conduct 'went beyond a mere continuation of the refusal to sell; it collected rentals on leases and entered into new leases when old machinery was no longer in working condition and required replacement.'" *Id.* (quoting *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 377 F.2d 776, 794 (3d Cir. 1967), *aff'd in part and rev'd in part*, 392 U.S. 481, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968)). The distinction that *Midwestern Machinery* then draws is between actively using an unlawful policy to maintain a monopoly and passively implementing anti-competitive policies, such as a refusal to deal. *Id.* When the latter occurs, "[e]xisting competitors must act when a rival initiates anti-competitive policies that do not require additional anti-competitive action to implement[,]" because "implementation is only a reaffirmation of the policy's adoption, and the statute begins to run as soon as the competitor suffers injury." *Id.* As to the former, "[o]nly where the monopolist actively reinitiates the anti-competitive policy and enjoys benefits from that action can the continuing violation theory apply." *Id.* at 271. "This distinction between 'new and accumulating injury on the plaintiff' (which restart[s] the statute of limitations) and unabated inertial consequences of previous

acts (which do not) allows the statute of limitations to have effect and discourages private parties from sleeping on their rights."  *Id.* (citation omitted).

The other Eighth Circuit decisions that must be noted are *Lomar Wholesale Grocery v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582 (8th Cir. 1987); and *Pioneer Co. v. Talon, Inc.*, 462 F.2d 1106 (8th Cir. 1972).

In *Pioneer*, the plaintiff sold Talon's products at wholesale.  When Talon learned that Pioneer was selling its products at discount prices, it refused to sell to Pioneer thereafter.  The issue was whether the statute of limitations accrued when Talon gave notice to Pioneer that it would no longer sell products to it or when subsequent orders were refused.  *Pioneer*, 462 F.2d at 1107.  The Eighth Circuit held that the cause of action accrued when orders were refused, not when notice was given, because even though Talon gave notice that it would refuse future orders, "it terminated nothing of legal significance" because, unlike the plaintiff in *Emich Motors*, it had no contract to terminate.  *Id*. at 1108.

In *Lomar Wholesale Grocery*, the Eighth Circuit again addressed the issue of when the cause of action of a terminated distributor accrued and held that the cause of action accrued when the termination first occurred, not on subsequent occasions when requests for reinstatement were denied. *Lomar Wholesale Grocery*, 824 F.2d at 586.  The court rejected the argument that the later denials of requests for reinstatement were tantamount to refusal to fill orders that had been placed subsequent to notice of termination, which *Pioneer* found would start the period of limitations anew. *Id*.  In rejecting the analogy with *Pioneer*, the court said that refusing a specific order was a "fresh instance" of a refusal to deal whereas declining a request for reinstatement as a distributor was "'merely the abatable but unabated inertial consequences'" of conduct that occurred outside the period of limitations and therefore conduct that did not give rise to a new cause of action. *Lomar*

*Wholesale Grocery*, 824 F.2d at 586. (quoting *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975)).

*Pioneer* and *Lomar Wholesale Grocery* are more pertinent to the case at hand than many cases that the parties have cited because they are cases in which the injury to the plaintiff was caused by a refusal to deal, which is the situation here.  Although the plaintiffs have asserted section 2 claims for monopolization, attempt to monopolize, and conspiracy to monopolize, the injury to them – the injury that gives rise to their claims for damages and for which they seek injunctive relief – is a refusal to deal.  As noted above, the third amended complaint alleges that USAble, acting for Blue Cross, terminated its network provider agreements with Little Rock Cardiology Clinic and its doctors in June 1997, while HMO Partners did so in September 1997.  That there were provider agreements that were terminated distinguishes this case from *Pioneer*, where "nothing of legal significance" was terminated.

With this discussion of the case law in mind, we turn to the acts that the plaintiffs allege show a continuing violation within four years of the filing of the complaint and the second amended complaint.

## A.   WHETHER PLAINTIFFS' CLAIMS ARE BARRED BY LIMITATIONS AS TO DEFENDANTS OTHER THAN BAPTIST HEALTH

The plaintiffs first argue that an overt act occurred in January 2006 when they were allowed back into some but not all of the network.  Understanding the plaintiffs' argument, as well as the reason why that argument fails, requires some historical background.

The Arkansas General Assembly enacted the Arkansas Patient Protection Act of 1995, Ark. Code Ann. § 23-99-201 *et seq*., popularly known as the "any willing  provider" statute, in 1995. That statute prohibited insurers from using monetary incentives or penalties to affect a health plan

beneficiary's choice of health care provider, and it required that every qualified health care provider who is willing to accept a health plan's terms, conditions, and fee schedule be allowed to participate. ARK. CODE ANN. § 23-99-204.  The statute excluded self-funded or other health benefit plans that are exempt from state regulation by virtue of ERISA.  ARK. CODE ANN. § 23-99-209.  On January 31, 1997, this Court entered an order permanently enjoining enforcement of that Act on the grounds that it was preempted by ERISA.  *See Prudential Ins. Co. of America v. Nat'l Park Med. Ctr., Inc.*, 964 F. Supp. 1285 (E.D. Ark. 1997).  Shortly thereafter, this Court entered an amended order stating that the any willing provider statute was preempted only as related to ERISA plans. On appeal, the Eighth Circuit held that the any willing provider statute was preempted in its entirety by ERISA, not only as it related to ERISA plans.  *Prudential Ins. Co. of America v. Nat'l Park Med. Ctr., Inc.*, 154 F.3d 812 (8th Cir. 1998).  On April 2, 2003, the Supreme Court held that a similar statute in Kentucky was not preempted.  *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 123 S. Ct. 1471, 155 L. Ed. 2d 468 (2003).  Ultimately, on August 2, 2005, this Court lifted the injunction against enforcement of the any willing provider statute except with respect to self-funded ERISA plans and certain civil penalties.

According to paragraph 164 of the third amended complaint, after the injunction against enforcement of the any willing provider statute was lifted, in January 2006 the plaintiffs were allowed back into the network with Arkansas Blue Cross and Blue Shield and HMO Partners but not as to "FirstSource or any network used by employer self-insured plans" so that "for the roughly 50% of the privately insureds in Arkansas who are covered by employer self-insurance programs," the plaintiffs "remain out of network."  This last phrase is key: as to plans that are preempted by ERISA, the plaintiffs "remain out of network."  Similarly, paragraph 62 alleges that the plaintiffs were excluded from the network in 1997, and "the defendants have never permitted the plaintiffs back into

the FirstSource network."  The action taken by the defendants in early 2006 was not a new and independent act that inflicted new and accumulating injury on the plaintiffs.  As to those persons covered by employer self-insured plans, the plaintiffs' situation now is the same as it was in 1997 when they were first excluded from the managed care network as a whole.  The action of the defendants in early 2006, allowing the plaintiffs into the network to the extent that the any willing provider statute could be enforced, helped the defendants; it did not injure them.  The decision continuing their exclusion from the network for employer self-insured programs was merely a reaffirmation of the decision in 1997 to exclude them from the network as to those programs.

The plaintiffs have also argued that Blue Cross's refusal to reimburse the cath lab opened by Little Rock Cardiology Clinic in 2003 is another new and independent act that inflicted new and accumulating injury on the plaintiffs.  Little Rock Cardiology Clinic had been excluded from the Blue Cross networks for six years by the time that the cath lab was opened.  According to the third amended complaint, during that time, Little Rock Cardiology Clinic, its doctors, and their patients made numerous requests to be readmitted into the network, but Blue Cross and HMO Partners "refused to budge from the exclusion."  Third Am. Compl., ¶ 141.  During that time, whenever a physician left Little Rock Cardiology Clinic, that doctor was "immediately reinstated to in-network status in both the PPO and the HMO."  Third Am. Compl., ¶ 142.  Conversely, whenever a doctor joined Little Rock Cardiology Clinic, that doctor was excluded from the network.  Third Am. Compl.,  ¶ 143.  Nothing in the third amended complaint offers any reason to believe that Blue Cross's refusal to reimburse Little Rock Cardiology Clinic's cath lab was anything other than the unabated inertial consequence of the 1997 decision not to do business with Little Rock Cardiology Clinic.

"Most courts see no continuing violation when the initial refusal to deal is 'irrevocable, immutable, permanent and final.'" II PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 320c, at 294 (3d ed. 2007) (quoting *Multidistrict Vehicle Air Pollution v. General Motors Corp.*, 591 F.2d 68, 72 (9th Cir.), *cert. denied*, 444 U.S. 900, 100 S. Ct. 210, 62 L. Ed. 2d 136 (1979)).   If ever a refusal to deal was "irrevocable, immutable, permanent, and final," this one was.   Throughout every change in the marketplace, Blue Cross has adhered to the policy adopted in 1997 that, to the extent permitted by law, it would refuse to deal with Little Rock Cardiology Clinic and its doctors. "In such circumstances, implementation is only a reaffirmation of the policy's adoption, and the statute begins to run as soon as the competitor suffers injury." *Midwestern Mach.*, 392 F.3d at 270.

Although not alleged in the third amended complaint, the plaintiffs also argue that Blue Cross committed an overt act in 2007.   The alleged overt act in 2007 was taken in response to a suit filed in state court by Little Rock Cardiology Clinic and others against Blue Cross to recover damages sustained while enforcement of the any willing provider statute was enjoined.   In response to the action for damages filed in state court, Blue Cross filed an action in this Court seeking to enjoin pursuit of the state-court action.   Blue Cross argued that the state-court action for damages was inconsistent with the injunction, and, therefore, this Court should enjoin pursuit of the state-court action.   This Court dismissed the complaint for lack of subject matter jurisdiction.   *See Ark. Blue Cross & Blue Shield v. St. Vincent Infirmary Med. Ctr.*, No. 4:07CV813, 2007 WL 4287842 (E.D. Ark. Dec. 5, 2007).   The action filed in this Court in 2007 did not seek to exclude the plaintiffs from competing in the market, however defined, and was not a new and independent act in furtherance of an antitrust violation that inflicted new and accumulating injury to the plaintiffs. *Midwestern Mach.*, 392 F.2d at 271.   It was a defensive move – a response to a complaint for damages – raising in this Court a

good faith defense that also could be and presumably was raised in state court after this Court dismissed for lack of jurisdiction.

As to Arkansas Blue Cross and Blue Shield, USAble Corporation, Baptist Medical System HMO, Inc., and HMO Partners, Inc., the plaintiffs' claims are barred because the third amended complaint alleges no acts occurring within four years of the filing of the second amended complaint on December 17, 2007, other than the unabated inertial consequences of the decision in 1997 not to deal with Little Rock Cardiology Clinic and its physicians.  As to those four defendants, all of the plaintiffs' claims are barred by the statute of limitations.

**B.      WHETHER PLAINTIFFS' CLAIMS AGAINST BAPTIST HEALTH ARE BARRED BY LIMITATIONS**

As mentioned, Baptist Health was named as a defendant in the original complaint, which was filed on November 2, 2006.  Baptist Health adopted its economic credentialing policy in 2003, which was less than four years before that complaint was filed.  The adoption of the economic credentialing policy can fairly be regarded as an overt act in furtherance of the alleged monopolization of a market for hospital services for cardiology patients and cannot fairly be regarded as the unabated inertial consequences of previous acts.  Baptist Health has argued that the plaintiffs have not been injured by the economic credentialing policy because enforcement of it was preliminarily enjoined in 2004, but the third amended complaint sufficiently alleges that the plaintiffs were injured by the enactment of the policy.  Therefore, the claims in Counts I-IV are not barred by limitations as to Baptist Health.

The third amended complaint alleges in Count V that Baptist Health was part of the conspiracy to monopolize the private insurance market and in Count VI that it was part of the attempt to monopolize that market.[6]  The plaintiffs argue that Baptist Health's adoption of the

---

[6] As noted above, Baptist Health is not named in Count VII.

economic credentialing policy in May 2003 is an overt act in furtherance of the conspiracy to monopolize the private insurance market.  As noted, that act occurred less than four years before the initial complaint was filed in this case, so, if it could fairly be regarded as an act in furtherance of the conspiracy to monopolize the private insurance market, the claims against Baptist Health alleging conspiracy and attempt to monopolize the private insurance market would not be barred by limitations, assuming that the claims in Counts V and VI relate back to the original complaint.

The factual allegations regarding the economic credentialing policy appear in paragraphs 146 through 154 of the third amended complaint.  Paragraph 146 alleges that in late 2002 Baptist Health learned that neurosurgeons and orthopedists on staff at Baptist Health planned to form a specialty hospital, which Baptist Health called the "spine hospital," and that the economic credentialing policy resulted from efforts to protect Baptist Health from the spine hospital.  According to paragraph 147, the purpose of the economic credentialing policy was to stifle competition from competing hospitals. That paragraph states, in part, "the President of Baptist Health has admitted under oath that the primary purpose, and the only purpose he could think of, for the policy was to discourage specialty hospitals from entering the marketplace and to exclude them from it."  Assuming these allegations to be true, the purpose of the economic credentialing policy was to stifle competition in the market for hospital services, not to stifle competition in the market for private insurance.

Paragraph 149 alleges that minutes of a meeting of the executive committee of Baptist Health show that there was to be "reconfirmation with Blue Cross regarding no access to network," meaning the network from which the plaintiffs were excluded in 1997.  Thus, the involvement of Blue Cross was to confirm the status quo.  No other involvement by Blue Cross in Baptist Health's economic credentialing policy is alleged.  No allegation is made that Blue Cross requested that Baptist Health

15

adopt that policy, nor that Baptist Health intended, when it adopted the policy, to benefit Blue Cross. Indeed, as noted, the specific factual allegation is that the purpose of the policy was to prevent specialty hospitals from competing with Baptist Health, not that its purpose was to assist Blue Cross. The third amended complaint does not allege that Blue Cross acted in 2003 to exclude from the network any physicians who had not already been excluded; and, as noted above, according to the third amended complaint, the cardiologists at Little Rock Cardiology Clinic are the only specialists in the state who have been excluded.  So far as the private insurance market is concerned, Baptist Health's economic credentialing policy changed nothing.

Although paragraph 223 alleges in conclusory fashion that adoption of the economic credentialing policy by Baptist Health in 2003 was an overt act in furtherance of the conspiracy to monopolize the private insurance market, the Court is not required to accept that conclusion.  *See Twombly*, 127 S. Ct. at 1965; *Stalley*, 509 F.3d at 521; *Wiles*, 280 F.3d at 870.  The detailed factual pleadings in paragraphs 146 through 154 – which the Court must and does accept as true – belie the conclusion in paragraph 223 that the economic credentialing policy was an overt act in furtherance of a conspiracy or an attempt to monopolize the market for private insurance.  It is true that plaintiffs' theory of the case is that Baptist Health and Blue Cross conspired each to aid the other in building two reciprocally reinforcing monopolies; but, even if that is true, Baptist Health's economic credentialing policy was, according to the third amended complaint, an action taken by Baptist Health to protect Baptist Health from competition from specialty hospitals, not an action taken by Baptist Health to protect Blue Cross from competition in the private insurance market.  Any connection between that policy and the private insurance market is too attenuated for the adoption of that policy to be deemed a continuing violation of the antitrust laws in the private insurance

16

market.  The third amended complaint, therefore, alleges no overt act in furtherance of the conspiracy or attempt to monopolize the private insurance market within four years of the date that the plaintiffs filed their initial complaint in this action.  The claims asserted against Baptist Health in Counts V and VI are barred by the statute of limitations.

As noted above, the claims against Baptist Health in Counts I-IV are not barred by the statute of limitations, so the Court must address the substance of those counts to rule on the motion to dismiss as to them.

### III.  THE RELEVANT MARKET FOR COUNTS I-IV

Because no per se violation of section 1 is alleged, it is necessary for the plaintiffs to allege a valid relevant market on the section 1 claim as well as on the section 2 claims.  *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998).

> If an antitrust complaint requires proof of a relevant market the plaintiff must allege such a market in its complaint, including the geographic market.  In addition, the pleading must be comprehensible, sufficiently particular to put the defendant on notice of the alleged market's boundaries, and plausible, or perhaps merely "conceivable."

IIB PHILLIP E. AREEDA, HERBERT HOVENKAMP & JOHN L. SOLOW, ANTITRUST LAW ¶ 531f (3d ed. 2007) (footnotes omitted).  Although courts should be hesitant to dismiss antitrust actions before discovery, and although the definition of the relevant market requires a factual inquiry into the commercial realities faced by consumers, there is no prohibition against dismissing an antitrust claim pursuant to Rule 12(b)(6) for failure to plead a relevant market.  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).  "[C]ourts have not hesitated to dismiss antitrust claims where it is clear that the alleged relevant market is too narrow, implausible, defined solely

by franchise agreement, or simply not defined anywhere in the pleadings." *Ferguson Med. Group, L.P. v. Missouri Delta Med. Ctr.*, No. 1:06CV8, 2006 WL 2225454, at *3 (E.D. Mo. Aug. 2, 2006).

A relevant product market has two components – a product market and a geographic market. *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345 (8th Cir. 1995)).  We turn first to the relevant product market.

## A.    THE PRODUCT MARKET

The third amended complaint alleges:

22.    The relevant product is those medical services that cardiology patients receive exclusively in a hospital from a cardiologist.  These include all interventions involving the heart and the more complex interventions involving peripheral arteries and organs.

23.    That patients obtain cardiology services only in conjunction with associated hospital services means that the relevant cardiology services and hospital services are not distinct products for purposes of antitrust analysis.  *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 43 (1984) (O'Connor, J., concurring).

The third amended complaint also alleges that there are two separate health insurance markets, one for government programs, most significantly Medicare and Medicaid, and one for private insurance.

The third amended complaint further alleges:

35.    This case involves the private insurance market, the hospital services market, and the cardiology services market.  The first relevant product market at issue in this lawsuit (a market to be examined for competitive injury) is the market for cardiology procedures obtained in hospitals by patients covered by private insurance.  In general, this product market includes all interventions involving the heart and the more complex peripheral interventions.

36.    The second relevant product market at issue in this lawsuit (also to be examined by competitive injury) is the market for private health insurance.  This market includes group health insurance plans, individual health insurance plans and employer self-insured health plans.

* * *

38.    The hospital services market in general (as opposed to for cardiology procedures) is also a subject of inquiry in this lawsuit, but plaintiffs do not assert

distinct injury in this market.  This general hospital services market is a source of defendants' market power that has been used for anticompetitive purpose and effect.

Count I alleges that the defendants have engaged in "anticompetitive conduct for the purpose of restraining commerce in the market for hospital services for cardiology patients covered by private insurance."  Count II is entitled "Conspiracy to Monopolize - Cardiology Procedures" and alleges that the defendants "have combined and conspired to monopolize the market for hospital services for privately insured cardiology patients . . . ."  Similarly, Count III is entitled "Attempt to Monopolize - Cardiology Procedures" and alleges, "defendants have attempted to monopolize the market for hospital services for privately insured cardiology patients . . . ."  Likewise, Count IV is entitled "Monopolization – Cardiology Procedures" and alleges, "Baptist Health has and continues to possess monopoly power in the market for hospital services for privately insured cardiology patients."

1.    **Assuming That The Relevant Product Market Is Defined in Terms of Cardiologist's Services, Counts I-IV of The Third Amended Complaint Must Be Dismissed.**

We have quoted at length from the third amended complaint because the first difficulty is determining what the plaintiffs intend to allege as the product market for Counts I-IV.  Because the plaintiffs are cardiologists, one might expect that the product market would be services offered by cardiologists, and some paragraphs in the third amended complaint appear so to state.  Paragraph 22, for example, defines the relevant product market as medical services that cardiology patients receive in a hospital from a cardiologist.

If that is the product market – services offered by cardiologists to hospitalized patients – then the section 2 claims asserted in Counts II, III, and IV necessarily fail.  No defendant offers the services that cardiologists offer, which is to say that no defendant competes in the market for

cardiology services. "Monopoly exists when one firm controls all or the bulk of a product's output and no other firm can enter the market, or expand output, at comparable costs." IIB ANTITRUST LAW ¶ 403a (footnote omitted). More simply, a monopoly is a market condition in which "only one economic entity produces a particular product or provides a particular service" or the market condition approaches that level of concentration. BLACK'S LAW DICTIONARY 1028 (8th ed. 2004). No one can monopolize a market if he does not produce the product or deliver the services constituting that market, which is to say that no one can monopolize a market in which he does not compete. No one can attempt to monopolize a market without attempting to compete in that market. No one can conspire to monopolize a market unless at least one of the coconspirators competes in that market. No defendant in this case offers the services that cardiologists offer, so no defendant in this case competes in the market of services offered by cardiologists. Even if the market is limited to services provided by cardiologists in a hospital, and even if it is limited to services provided by cardiologists in a hospital to patients who are privately insured, nevertheless, no defendant competes or is alleged to compete in that market. No defendant has market power in that market. *Cf. Gordon v. Lewistown Hosp.*, 272 F. Supp. 2d 393, 421 n.24 (M.D. Pa. 2003) ("The [h]ospital . . . is not a participant in the physician services aspects of these markets and, therefore, cannot possess market power in those markets."). Thus, as a matter of law, Counts II, III, and IV fail to state a claim for relief if the relevant product market consists of services offered by cardiologists.

The section 1 claim also must be dismissed if the relevant product market consists of services offered by cardiologists. If a defendant has no market power in the relevant market, the plaintiff must allege adverse effects on competition in the relevant market, which in this instance would mean an adverse effect on competition among cardiologists, such as increased prices for services offered

by cardiologists or a decline in either the quality or quantity of services offered by cardiologists. *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 662 (8th Cir. 2000); *Flegel v. Christian Hosp., Northeast-Northwest*, 4 F.3d 682, 688-89 (8th Cir. 1993). If the product market is limited to medical services offered by cardiologists in a hospital to patients who are privately insured, the plaintiffs would need to allege adverse effects on competition in that market, such as increased prices for services by cardiologists to privately insured patients in hospitals, or a decline in either the quality or quantity of services by cardiologists to privately insured patients in hospitals. *Minn. Ass'n of Nurse Anesthetists*, 208 F.3d at 662. However, the third amended complaint makes no such allegations.

The third amended complaint touches on the issue of competition among cardiologists only in paragraphs 49 and 50, which are in the section of the third amended complaint describing the alleged geographic market, not in the section describing the alleged product market. Paragraphs 49 and 50 allege:

> 49. Little Rock is also where Arkansas's cardiologists are located. According to information from the Arkansas Medical Board, there are 138 cardiologists in the entire state of Arkansas, and 51 of them reside in the Central Public Health Region cities of Conway, Hot Springs, Little Rock, North Little Rock, and Pine Bluff. Of these 51, 41 are in Little Rock and North Little Rock. This is 80% of the total from the Region, and 29% of the state-wide total. As between Little Rock and North Little Rock, 33 cardiologists are in Little Rock and 8 are in North Little Rock. The reason why cardiologists reside in the Little Rock market in these numbers is that it is the largest market for cardiology services in the state, retaining the overwhelming majority of Little Rock patients who seek cardiology services and drawing large numbers of patients from around the state for medical procedures that require hospital services.

> 50. In addition, a larger percentage of the cardiologists who perform in-hospital procedures known as interventional cardiology, including the plaintiffs, are located in Little Rock rather than outside of Little Rock.

Nowhere does the third amended complaint allege that the anticompetitive conduct of the defendants has resulted in cardiologists raising their prices for privately insured patients in hospitals or, for that matter, any other patients. Nowhere does the third amended complaint allege that the anticompetitive conduct of the defendants has caused a decline in the number of cardiologists or in the quality of the services offered by cardiologists. Because the third amended complaint is silent as to the impact on competition among cardiologists, as distinct from the impact on the plaintiffs, and because no defendant has market power in the market for services offered by cardiologists, if the product market consists of services offered by cardiologists, Count I, which alleges a restraint of trade in violation of section 1 of the Sherman Act, like Counts II, III, and IV, fails to state a claim for relief and therefore must be dismissed. *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 245 (6th Cir. 1982) ("Since the complaint does not allege facts suggesting that Chrysler's refusal to deal had any significant anti-competitive effect on the market, there is no rule of reason case alleged.").

2. **Assuming That The Plaintiffs Intend to Allege That The Product Market Includes Both Cardiologists' Services and Hospital Services, Counts I-IV of The Third Amended Complaint Must Be Dismissed.**

The third amended complaint contains extensive allegations of harmful effects on competition among hospitals that admit cardiology patients. The summary of these allegations is that the Arkansas Heart Hospital provides better quality services while charging lower prices than the Baptist Hospital in Little Rock. *See* Third Am. Compl., ¶¶ 166-173.

The observation that the third amended complaint alleges adverse effects on competition among hospitals that admit cardiology patients brings us to an alternative way of construing the third amended complaint's allegations regarding the relevant product market. Although paragraph 22

alleges that the relevant product market consists of medical services provided by cardiologists to patients in hospitals, the next paragraph alleges that, because patients obtain these cardiology services only in conjunction with associated hospital services, "the relevant cardiology services and the hospital services are not distinct products for purposes of antitrust analysis." Paragraph 35 alleges that the case involves the private insurance market, the hospital services market, and the cardiology services market, and, "[t]he first relevant product market at issue in this lawsuit (a market to be examined for competitive injury) is the market for cardiology procedures obtained in hospitals by patients covered by private insurance." This sentence, consistently with paragraph 23, appears to conflate the market for services offered by cardiologists to hospitalized patients with the market for services offered by hospitals to cardiology patients, so that the alleged product market is a single "market for cardiology procedures obtained in hospitals by patients covered by private insurance." Counts I-IV of the third amended complaint describe the market as "the market for hospital services for cardiology patients covered by private insurance" or "the market for hospital services for privately insured cardiology patients" without distinguishing between a market for services offered by cardiologists to hospitalized patients and a market for services offered by hospitals to cardiology patients. Viewing all of these allegations together, it appears that the key to understanding the plaintiffs' theory as to the relevant product market is the assertion in paragraph 23 of the third amended complaint that cardiology services and hospital services "are not distinct products for purposes of antitrust analysis" for cardiology patients who require hospitalization. The plaintiffs likewise argue in their brief in response to the motions to dismiss that, because a cardiology patient in the relevant market must have both a hospital and a cardiologist, the services offered by a hospital

and the services offered by a cardiologist to such a patient comprise a single product for purposes of antitrust analysis.

Thus, it appears that the plaintiffs intend to allege that the services offered by a hospital and the services offered by a cardiologist to hospitalized cardiology patients constitute one product for purposes of antitrust analysis; and they justify treating the services of the hospital and the services of the cardiologist as one product on the basis that a hospitalized cardiology patient needs both a hospital and a cardiologist. That a hospitalized cardiology patient needs both a hospital and a cardiologist is undoubtedly true; the legal conclusion that therefore the services offered by hospitals and the services offered by cardiologists to hospitalized cardiology patients are in the same product market is false. The leading treatise on antitrust law explains:

> Substitutes are goods that can replace one another and thus "compete" for the user's purchase. For example, Chevrolets are substitutes for Fords, and coal in many uses is a substitute for natural gas. By contrast, complements are goods that are most efficiently made or used together. For example, gasoline and automobiles are complements, as are computer hardware and software, toasters and bread, or beef and leather. If two goods are produced most efficiently when they are made together, such as beef and leather, or lumber and sawdust, we speak of "complements in production." If two goods are consumed most efficiently when used together, such as bread and toasters or hardware and software, we speak of complements in demand," or "complements in consumption."

> When two goods are in the same relevant market – that is, substitutes rather than complements – a price increase in one typically occasions a price increase in the other. For example, if coal and natural gas are in the same market, a reduction in coal output will increase the demand for natural gas, thus causing its price to increase, as well as the coal price. Indeed, the entire concept of a "market" includes the notion that the prices of the goods in the market tend to be uniform, or to rise and fall together.

> In contrast, when goods are complements in demand, their prices tend to move in opposite directions. For example, gasoline and automobiles are complements, because a driver needs both. A significant output reduction and price increase in gasoline will cause less driving, which will reduce the demand for cars, causing a price decrease there.

Importantly, when the goods at issue are complements, the presence of market power in one says virtually nothing about the presence of market power in the other, even if a firm makes both. For example, a firm could be a monopoly producer of both cars and gasoline, a competitive producer of both, or a monopoly producer of one and a competitive producer of the other. A firm might have a monopoly in software, such as the Windows operating system, while computers, which are the complementary product that make Windows valuable, are sold in a highly competitive market.

It should be clear that a relevant market consists only of goods that are reasonably close *substitutes* for one another. Economists have understood markets this way for more than a century. The Supreme Court has indicated that relevant markets are composed of substitutes by defining market boundaries in terms of cross-elasticity of demand. That term speaks of the rate at which people will substitute one item in response to a price increase in a different item – a comparison that applies only to a relationship of substitution.

\* \* \*

Grouping complementary goods into the same market is not only economic nonsense, it also undermines the rationale for the policy against monopolization or collusion in the first place. One "monopolizes" a market by reducing output, and once certain output is removed from the market, the remaining output experiences increase demand and a rise in prices. Thus a monopolist might monopolize the market for gasoline by reducing output from the competitive level of, say, 1,000,000 barrels, to a monopoly level of 700,000, with the result that demand intensifies for that which remains and the market clearing price rises. No such result obtains when one aggregates complementary goods into the same market. For example, grouping gasoline and tires in a "market" suggests that an output decrease in gasoline would permit an increase in tire prices. In fact, it will do just the opposite.

In grouping nonsubstitutable and complementary parts into a single relevant market, the Ninth Circuit invoked the "commercial reality" that a service provider needed access to all the parties in order to provide service for Kodak photocopiers, and that the only inventory of "all parts" was Kodak's warehouse. But many "commercial realities" describe a particular market situation, and their invocation should not become an after-the-fact rationalization for a conclusion that is completely inconsistent with the economic rationale for defining markets. It is also a commercial realty that one must have both a toaster and bread to make toast, or both gasoline and an automobile to drive.

In sum, a "commercial reality" provides evidence of a single relevant market if it tends to show the economic conditions meeting the criteria for a relevant market – namely, that items in the proposed market are substitutes for one another, that customers can respond to a price increase in one by using the other instead, that suppliers can respond to price increases in one item by switching to producing it rather than the other, or that firms have to compete with one another to make the sale.

25

IIB ANTITRUST LAW ¶ 565a (footnotes omitted); *see also Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1264 (10th Cir. 2006); *United States v. Microsoft Corp.*, 253 F.3d 34, 86 (D.C. Cir. 2001).

The plaintiffs attempt to avoid the conclusion that their services and those of Baptist Health are in separate markets by asserting that the question is one of fact, not of law, but that assertion is wrong. Assuming as true the well-pleaded and irreproachable allegation that hospitalized cardiology patients require services from both a cardiologist and a hospital, what follows is not that both sets of services are in the same product market but rather the opposite – the two sets of services are complements, not substitutes, and therefore are not in the same product market. This is not a factual question, but a legal one: does the law provide that, because a hospitalized cardiology patient requires both a cardiologist and a hospital, the services of the cardiologist and the services of the hospital are in the same product market? The answer is no.

The plaintiffs cite Justice O'Connor's concurring opinion in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 43, 104 S. Ct. 1551, 1574, 80 L. Ed. 2d (1984) (O'Connor, J., concurring), for the proposition that, because hospitalized cardiology patients require both a cardiologist and a hospital, the two services are not distinct products for antitrust purposes. Justice O'Connor's concurring opinion did say that there was no sound economic reason for treating surgery and anesthesia as separate services. *Id.* at 43, 104 S. Ct. at 1574. However, the opinion of the Court said, "the hospital's requirement that its patients obtain necessary anesthesiological services from Roux combined the purchase of two distinguishable services in a single transaction." *Id.* at 24, 104 S. Ct. at 1564-65 (majority opinion); *see also Konik v. Champlain Valley Physicians Hosp. Med. Ctr.*, 733 F.2d 1007, 1017 (2nd Cir. 1984) ("In light of the Supreme Court's recent ruling in *Hyde*,

there seems to be little question that the Hospital's operating room facilities and the provision of anesthesiology service must be viewed as separate services.") In *Hyde*, the hospital sold its services and those of anesthesiologists in a single transaction, and, when that arrangement was challenged as an illegal tie, the district court, the court of appeals, and the Supreme Court all held that anesthesiological services and hospital services were separate services. The reason was that "consumers differentiate between anesthesiological services and other hospital services . . . ." *Hyde*, 468 U.S. at 23, 104 S. Ct. at 1564. Here, no allegation is made that any hospital sells its services and those of cardiologists in a single transaction and no allegation is made that consumers fail to differentiate between them. The behavior of buyers and sellers as alleged in the third amended complaint is inconsistent with the argument that services offered by cardiologists to hospitalized patients are services offered by hospitals to cardiology patients as one product.[7]

Finally, as support for their argument that the services offered by a hospital to cardiology patients and the services offered by a cardiologist to hospitalized patients should be regarded as a single product for antitrust purposes, the plaintiffs cited at oral argument the following paragraph from the Areeda treatise:

> Often the "clustering" problem goes away with more careful attention to the precise input that is being monopolized. Consider a relevant market for "surgical services." Clearly, a heart bypass is not a substitute for an appendectomy, and neither one is a substitute for the surgical repair of a gunshot wound. But the problem of clustering nonsubstitutes vanishes when we realize that any source of monopoly power lies in the *facility*, in this case the hospital's operating room and supporting equipment. Thus, for example, a local telephone company may have monopoly power over its telephone network, which we can describe as a relevant market, notwithstanding that the various services dependent on the network, which include voice conversations,

---

[7] The plaintiffs' argument on this point is also inconsistent with their (so far successful) argument in state court that Baptist Health's economic credentialing policy constitutes tortious interference with the doctor-patient relationship. *See Baptist Health v. Murphy*, 365 Ark. at 123-25, 226 S.W.3d at 807-08.

fax transmissions, and Internet access, may not be good substitutes for each other. While in *Grinnell* the Supreme Court considered itself to be clustering noncompetitive products, such as fire and burglary alarm protection, the then-existing technology of the central station alarm protection industry indicates that the adopted grouping was not "clustering" at all, but the simple provision of remote protective services and alarm connections through a single telephone line, with a single operator monitoring the various alarms.

IIB Antitrust Law ¶ 565c.  The plaintiffs construe this paragraph to say services offered by a surgeon and services offered by a hospital may be "clustered" for purposes of defining a relevant market, but that is not what the paragraph says.  What the paragraph says is that, even though an appendectomy is not a substitute for surgical repair of a gunshot wound, when the hospital offers its services for an appendectomy and for repair of a gunshot wound, it is not offering two services but only one: a facility for surgery – an operating room and supporting equipment.  This paragraph does not say that the hospital's services and those of the surgeon can be clustered for purposes of defining a product market.  This paragraph is part of a section of the treatise devoted to explaining the principle, "Most fundamentally, goods cannot be clustered unless there is a sufficient basis for inferring that the defendant has the required degree of market power over each of the goods in the cluster." *Id*.  Here, as has been noted, Baptist Health does not compete in the cardiologists' services market; it has no market share and therefore no market power in the market for cardiologists' services.  Therefore, the relevant product market cannot include both the services offered by hospitals and the services offered by cardiologists.

In summary, if the plaintiffs intend to allege that the relevant product market consists of services offered by cardiologists to privately insured hospitalized patients, Counts I-IV of the third amended complaint fail to state a claim upon which relief can be granted because no defendant competes in that market and the third amended complaint contains no allegations of an adverse effect

on competition in that market; and, if the plaintiffs intend to allege that, because hospitalized cardiology patients need both a hospital and a cardiologist the services of both must be treated as one for purposes of determining the relevant product, Counts I-IV of the third amended complaint must be dismissed for failure to state a claim because, as a matter of law, complementary products sold separately are not in the same product market.

### 3. The Relevant Product Market for Counts I-IV Cannot Be Defined by Reference to Whether The Patients Who Receive Services Are Privately Insured.

As the defendants have noted, the allegations regarding the relevant product market for Counts I-IV of the third amended complaint have yet another difficulty, and on this one there is no doubt as to what the plaintiffs intend to allege: the plaintiffs intend to restrict the relevant product market to services offered to patients who have private insurance.  In other words, Counts I-IV of the third amended complaint exclude from the relevant product market services offered to hospitalized cardiology patients covered by Medicare or Medicaid, and they also exclude from the relevant product market services offered to cardiology patients who have no insurance.  Thus, the plaintiffs propose to define the product market, in part, by how different customers pay for the services – which is not the way that the product market is defined.

The argument that the product market can be defined in part by reference to whether purchasers pay with private insurance, through a government program, or otherwise, is a novel argument for which there is little or no precedent, but, even without precedent, the Court has no doubt that defining the product market in this manner is inconsistent with the basic notion of a product market.  How a purchaser pays for a product is irrelevant to the question of what the product is or whether the purchaser would consider that item or service interchangeable with another.  As

a standard jury instruction explains it, "in determining the product market, the basic idea is that the products within it are interchangeable as a practical matter from the buyer's point of view."  3A KEVIN F. O'MALLEY, JAY E. GRENIG & WILLIAM C. LEE, FEDERAL JURY PRACTICE & INSTRUCTIONS: CIVIL § 150.66 (5th ed. 2001).  From the buyer's point of view, there may be an issue as to whether the services offered by one physician are interchangeable with the services of another or whether the services offered by one hospital are interchangeable with those of another, but how the buyer pays for the services is not relevant to the question of which services are interchangeable with one another.

During oral argument, when asked for the best authority for the proposition that the product market can be limited in terms of how consumers pay for the services, counsel for the plaintiffs cited *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951 (10th Cir. 1990).  In *Reazin*, the product market was "private health care financing."  *Id*. at 959 & n.10.  *Reazin* may be relevant to the plaintiffs' arguments that they have standing to sue for monopolization of the market for private health insurance as alleged in Counts V-VII of the third amended complaint, but it offers no support for the argument that the product market alleged in Counts I-IV – the market for services to hospitalized cardiology patients – can be defined by reference to whether the patients pay for those services with private insurance.

The reason that the plaintiffs wish to define the product market as services to privately insured patients is that the wrongful act of which they complain and for which they seek equitable and monetary relief is their exclusion from the FirstSource network.  The notion that the market for a service provider excluded from a healthcare network can be limited to consumers with private

insurance was rejected in *Stop & Shop v. Blue Cross & Blue Shield of Rhode Island*, 373 F.3d 57 (1st Cir. 2004), where the court held:

> Unfortunately for [plaintiffs' expert's] market definition, the concern in an ordinary exclusive dealing claim by a shut-out supplier is with the available market *for the supplier*.  Here, for Walgreen and Stop & Shop, their potential customers are presumptively *all* retail customers for prescription drugs – not just that smaller sub-group who are insured or reimbursed.  To say that some sub-group of customers is foreclosed proves nothing by itself about the impact on pharmacies.

*Id*. at 67.  Here, for the cardiologists at the Little Rock Cardiology Clinic who are excluded from the FirstSource network, their potential customers are all persons who need cardiologists' services, not just that smaller subgroup who are insured or reimbursed.  To say that these cardiologists are foreclosed from the FirstSource network says nothing about the impact on competition among cardiologists.  For each of the first four counts in the third amended complaint, a proper market definition would have to include all cardiology patients, or at least all hospitalized cardiology patients.  *See also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513-14 (3d Cir. 1998).

## B.    THE GEOGRAPHIC MARKET

The geographic market "includes the geographic area in which consumers can practically seek alternative sources of the product, and it can be defined as 'the market area in which the seller operates.'" *Double D Spotting Serv.*, 136 F.3d at 560 (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S. Ct. 623, 628, 5 L. Ed. 2d 580 (1961)).  "A geographic market is determined not by where consumers *actually* go for a particular product or service, but rather by where they *could* go should the defendants' prices become anticompetitive." *Ferguson Med. Group*, 2006 WL 2225454, at *2; *see also Bathke*, 64 F.3d at 345.  Although this is ordinarily a factual

inquiry, courts have not hesitated to dismiss antitrust claims where it is clear that the alleged geographic market is too narrow or implausible. *Ferguson Med. Group*, 2006 WL 2225454, at *3.

The third amended complaint defines the relevant geographic market as the cities of Little Rock and North Little Rock. On the face of it, it seems implausible that the geographic market for cardiologists who practice in Little Rock or North Little Rock or for hospitals in Little Rock and North Little Rock would be limited to the city limits, and the parties have cited no comparable case in which the geographic market coincided with the city limits. 2 JOHN MILES, HEALTH CARE & ANTITRUST LAW § 12:11 (2008) ("Arbitrary geographical and political boundaries rarely should constitute relevant geographic markets for antitrust purposes because their establishment's [sic] usually based on factors other than competitive relationships among the hospitals in the area."). Moreover, the third amended complaint includes factual allegations that are inconsistent with the definition of the geographic market, and the method of defining the geographic market, as explained in the third amended complaint, is flawed as a matter of law.

Although the trade area for a business and the relevant geographic market in which it competes are not identical, it seems logical that the relevant geographic market will not be smaller and usually will be larger than the trade area because, by definition, the business is competing for customers throughout its trade area, so that area must be in the geographic market; and, in addition to the trade area, the geographic market must include places to which that business's customers could turn to obtain the product. *Cf. Bathke*, 64 F.3d at 346.

Paragraph 51 of the third amended complaint alleges that the hospitals in Little Rock serve not only 99.5% of residents in Little Rock, "but also a large percentage of residents from around the state who need cardiology services in hospitals." "Where substantial immigration occurs, the

32

outlying area may need to be included in the relevant geographic market even if outmigration is small." 2 HEALTH CARE & ANTITRUST LAW § 12:11.  Paragraph 161 of the third amended complaint alleges that a cardiologist in El Dorado, which is 117 miles from Little Rock (nearly the same distance from Little Rock as is Memphis), referred patients to the Arkansas Heart Hospital because Baptist Health had no room for admitting more cardiology patients.  Paragraph 43 of the third amended complaint alleges:

> The hospitals in surrounding areas that offer cardiology services, such as Conway Regional Medical Center and hospitals in Searcy,[8] are not equipped to receive significant numbers of cardiology patients from Little Rock, and some of the more sophisticated cardiology procedures are available only at Little Rock hospitals.  For this reason, Little Rock hospitals attract patients in large numbers from outside of Little Rock for cardiology procedures, but Little Rock cardiology patients rarely go outside of the Little Rock market for these services.

These allegations show, first, that the market area in which the seller operates is larger than simply the cities of Little Rock and North Little Rock and, secondly, that there are competitors, such as the Conway Regional Medical Center and hospitals in Searcy, to which at least some cardiology patients who currently seek medical services in Little Rock or North Little Rock could turn.  If the hospitals in those cities offer services to cardiology patients, it follows that there must be cardiologists also offering services there.  Paragraph 49 of the third amended complaint indicates that ten cardiologists reside in Conway, Hot Springs, or Pine Bluff.  Even if these hospitals and cardiologists could not receive significant numbers of cardiology patients from Little Rock and North Little Rock, that fact alone would not exclude them from the geographic market.  The third amended complaint, itself, makes clear that some cardiology patients who could seek medical services in Little

---

[8] The use of the phrase "such as," indicates that there are surrounding cities other than Conway and Searcy in which hospitals that admit cardiology patients are located.  In light of the allegations in paragraph 49, presumably these cities would include Pine Bluff and Hot Springs.

Rock or North Little Rock instead seek treatment in surrounding cities such as Conway and Searcy, and so, at a minimum, Conway and Searcy must be included in the geographic market even if very few cardiology patients who reside in Little Rock or North Little Rock currently seek treatment in Conway or Searcy.

Paragraph 45 alleges, in pertinent part, "of the privately insured cardiology patients who reside in Little Rock and its surrounding areas, which are the zip codes that begin with 722 and 721, 84.7% use hospitals in Little Rock.  The remaining 15.3% of cardiology patients in these zip codes use hospitals in North Little Rock and Conway."  Paragraph 46 then alleges:

> The area covered by the 722 and 721 three-digit zip codes is larger than the geographic market at issue, which is the cities of Little Rock and North Little Rock. On information and belief, the percentage of cardiology patients in Little Rock and North Little Rock who use hospitals in Little Rock exceeds 85% and approaches 95%.

No reason appears for excluding from the geographic market the "surrounding areas" described in paragraph 45 where some of the residents use hospitals in Conway.  Mayflower, for instance, has a 721 zip code and is between North Little Rock and Conway so that its residents could seek medical services in either city.  Sherwood, which has four zip codes, all of which start with 721, is contiguous with North Little Rock.  No reason appears for excluding Sherwood and Mayflower from the geographic market; and the same can be said of other surrounding areas.  There is no apparent reason why Cabot, which is between North Little Rock and Searcy, would not be included in the relevant geographic market.  Both common sense and the allegations in the complaint indicate that cardiology patients in these surrounding areas, such as Mayflower, Sherwood, and Cabot, can and do obtain services in Little Rock and North Little Rock.  Accepting the allegations in the complaint as true, it also would seem that cardiology patients who live in Mayflower could turn to

Conway for treatment, while cardiology patients who live in Cabot could turn to Searcy or Cabot for treatment. No reason appears for limiting the relevant geographic market to the city limits of Little Rock and North Little Rock other than to gerrymander the geographic market.

If the geographic market were not implausible on its face, little might be required in the complaint to survive a motion to dismiss, but where, as here, the geographic market alleged in the complaint appears implausible, more detailed pleading to justify the alleged geographic market may be required. *See* IIB ANTITRUST LAW ¶ 531f, at 238-40.

The plaintiffs justify limiting the relevant geographic market to Little Rock and North Little Rock by alleging that as many as 95% of cardiology patients in Little Rock and North Little Rock seek cardiology services in Little Rock or North Little Rock. For purposes of ruling on the motion to dismiss, the Court must and does assume that that fact is true. Nevertheless, the fact that nearly every cardiology patient in Little Rock and North Little Rock currently seeks cardiology services in Little Rock or North Little Rock does not mean that Little Rock and North Little Rock may be defined as the relevant geographic market. This approach to defining the relevant geographic market was rejected by the Eighth Circuit in *Morgenstern v. Wilson*, 29 F.3d 1291 (8th Cir. 1994). In *Morgenstern*, a cardiac surgeon in Lincoln, Nebraska, prevailed at trial on his claim other surgeons in Lincoln had monopolized the market for cardiac surgery. On appeal, the Eighth Circuit reversed because the plaintiff's geographic market was, as a matter of law, too narrow, and because he could not show monopoly power in a properly drawn geographic market. In that case, the plaintiff presented expert testimony that the geographic market included 26 counties and extended some 200 miles from Lincoln but excluded Omaha "because patients overwhelmingly went to the closest hospital." *Id*. at 1297. The Eighth Circuit held that that method of defining the geographic market

was invalid as a matter of law because it did not address where patients could practically turn for alternatives. *Id.* at 1296-97. Likewise, in *Ferguson Medical Group*, the plaintiff proposed a geographic market that included areas from which 80-90% of its and the defendant's patients came, but the court held that the proposed geographic market was invalid as a matter of law because it was "based on where defendant's customers actually go for services, not where the customers could practically turn for services" and that "consumer preference, alone, is not a sufficient basis on which to determine a geographic market." *Ferguson Med. Group*, 2006 WL 2225454, at *4; *see also Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1*, 309 F.3d 836, 840 (5th Cir. 2002); *Minn. Ass'n of Nurse Anesthetists*, 208 F.3d at 662; *Federal Trade Comm'n v. Tenet*, 186 F.3d 1045, 1052 (8th Cir. 1999). If the plaintiffs' method of defining the geographic market were valid, antitrust plaintiffs could define a market by identifying any small area around the defendant's location in which nearly all potential customers patronize the defendant. If the geographic market could be defined in that manner, if everyone within a block of a hospital always seeks treatment at that hospital, the geographic market could be as small as one block, which is absurd.

In short, as to Counts I-IV, not only does the third amended complaint fail to allege a coherent product market, it also fails to allege a proper geographic market.

## IV. COUNT VIII

Count VIII seeks an injunction "compelling the defendants to admit plaintiffs to their plans for self-insured employees and to reimburse the LRCC cath lab on the same terms as they reimburse hospitals that provide the same services." Third Am. Compl., ¶ 247. Having dismissed Counts I-IV for failure to state a claim for relief, the Court cannot award injunctive relief on those claims, so the

only issue is whether the Court should entertain plaintiffs' claims for injunctive relief for the antitrust

violations in the market for private insurance alleged in Counts V-VII.

The period of limitations provided in section 4B of the Clayton Act does not apply to claims

for equitable relief. II ANTITRUST LAW ¶ 320g. However, antitrust claims for equitable relief are

subject to the equitable doctrine of laches. *Id*. The doctrine of laches provides that an equitable

claim is barred if the plaintiff is guilty of unreasonable and inexcusable delay that results in prejudice

to the defendant. *Midwestern Mach.*, 392 F.3d at 277. Some courts have said that the four-year

statutory limitation period for damage actions should be used as a guideline in considering whether

claims for equitable relief are barred. II ANTITRUST LAW ¶ 320g, at 326; *IT&T Corp. v. General Tel.*

*& Elec. Corp.*, 518 F.2d 913, 928 (9th Cir. 1975), *overruled on other grounds, California v.*

*American Stores Co.*, 495 U.S. 271, 110 S. Ct. 1853, 109 L. Ed. 2d 240 (1990); *see also Aurora*

*Enters., Inc. v. Nat'l Broad. Co., Inc.*, 688 F.2d 689, 694 (9th Cir. 1982) ("If the district court had

explicitly applied that guideline, it would have correctly dismissed a request for injunctive relief on

the ground of laches."); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d

1045, 1057 (5th Cir. 1982). However, "the operation of laches departs from that of statutes of

limitations in that laches is more flexible." *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800,

805 (8th Cir. 1979). The application of laches requires the court "to examine all aspects of the

equities affecting each case." *Id*. at 806. In the Eighth Circuit, the "statute of limitation is a rough

rule of thumb in considering the question of laches, and constitutes a pertinent factor in evaluating

the equities." *Reynolds v. Heartland Transp.*, 849 F.2d 1074, 1075-76 (8th Cir. 1988); *see also*

*Midwestern Mach.*, 392 F.2d at 277. In *Reynolds*, the court affirmed application of laches based on

unreasonable delay by the plaintiff without discussing whether the delay had caused prejudice to the defendant.

According to the third amended complaint, the conspiracy to monopolize the private insurance market began no later than 1997, the alleged injury to the plaintiffs occurred when the plaintiffs were excluded from the defendants' managed care network in 1997, and Blue Cross had achieved a monopoly in that market by 2001.  Nevertheless, the plaintiffs did not allege their claims regarding the private insurance market until March 27, 2008, when they filed the third amended complaint.  The statute of limitations expired long before these claims were asserted.  These plaintiffs waited almost eleven years after they were excluded from the network and almost seven years after the defendants allegedly had achieved monopoly power in the private insurance market before seeking relief.  The wrongful conduct was not hidden.  These plaintiffs knew immediately when they were excluded from the network.  In view of the history of litigation between these parties, it would be too much to say that they slept on their rights; but it is not too much to say that they slept on their rights to equitable relief under the Sherman and Clayton Acts.

The plaintiffs have offered no justification for their delay.  None of the parties specifically addressed the issue of prejudice.  The defendants have not cited any prejudice that the delay caused nor have the plaintiffs argued that the Court should not invoke the doctrine of laches inasmuch as the defendants have cited no prejudice to them.  Here, the delay has been lengthy, and the statute of limitations has long since run.  Had the plaintiffs offered some reasonable justification for the delay or argued that laches should not apply because the defendants have suffered no prejudice, the Court might hold that the equitable claims are not barred by laches; but in the absence of one or the other,

in considering all of the equities, the Court has concluded that the balance weighs in favor of dismissing the equitable claims as barred by laches.  Count VIII is therefore dismissed.

## CONCLUSION

The Court has concluded, with some reluctance and perhaps belatedly, that the third amended complaint must be dismissed with prejudice.  Nearly two years after the commencement of this action, "there continues to be no hint of a coherent and promising antitrust claim."  *Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 9 (1st Cir. 2004).  The plaintiffs may have one or more claims for intentional interference with contractual relationships or business expectancies; they may have claims for damages arising under the any willing provider statute; and they may have other claims.  But they have no viable antitrust claims.  Their continued inability to plead a coherent relevant market has led the Court to the conclusion that, not only must Counts I-IV be dismissed, but also that they must be dismissed with prejudice.  The third amended complaint also shows that Counts V, VI, and VII are barred by the statute of limitations.  Except as to Baptist Health, the claims asserted in Counts I-IV also are barred by the statute of limitations.  The claims for equitable relief are barred by laches.  Therefore, the third amended complaint in its entirety is dismissed with prejudice.

IT IS SO ORDERED this 29th day of August, 2008.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE